PEOPLE v STRODDER

Docket No. 54892. Argued September 11, 1974 (Calendar No. 11).—
Decided May 27, 1975. Rehearing denied 395 Mich 902.

Mandric Strodder was convicted of first-degree murder in a trial
without a jury before Philip C. Elliott, J., in Genesee Circuit
Court. At the beginning of the trial defendant twice requested
the appointment of a different lawyer to represent him because
of his displeasure with assigned counsel, but his requests were
denied. As the trial progressed, defendant expressed complete
satisfaction with assigned counsel. During the trial, the defense
began to develop a new theory of defense, in addition to the
insanity defense. When the trial court refused to accede to
defense requests that the record in the case be impounded, that
no further prosecutions go on in the county, that the court and
the prosecutor be immediately suspended from office, and that
defendant be immediately set free, defense counsel and defend-
ant refused to have anything to do with the proceedings and
the court adjourned. The court appointed another lawyer as co-
counsel for defendant, and arranged to have a psychiatrist
observe original defense counsel at trial; that psychiatrist
testified that in his opinion original defense counsel was able to
perform his duties. Throughout the rest of the trial, original
defense counsel was abusive to the trial judge, the prosecutor
and other public officials. The court found the defendant guilty
of first-degree murder. The Court of Appeals, Bronson, P. J.,
and McGregor and Danhof, JJ., affirmed (Docket No. 13131).
Defendant appeals. The Supreme Court reverses and remands
for a new trial, pursuant to the opinion of T. G. Kavanagh,
C. J., in which Levin, J., concurred, on the ground that an

REFERENCES FOR POINTS IN HEADNOTES

[1, 2, 12] 21 Am Jur 2d, Criminal Law §§ 234–240, 315.
[3, 5, 7] 21 Am Jur 2d, Criminal Law § 321.
[4] 21 Am Jur 2d, Criminal Law § 318.
[6] 21 Am Jur 2d, Criminal Law § 320.
[8] 21 Am Jur 2d, Criminal Law § 315.
[9] 58 Am Jur 2d, New Trial § 161.
[10] 40 Am Jur 2d, Homicide §§ 425, 454.
[11] 21 Am Jur 2d, Criminal Law § 62 et seq.

examination of the record leaves the abiding conviction that the procedure followed did not accord the defendant a fair trial and the opinion of Williams, J., on the ground that defendant was deprived of a fair trial because of ineffective assistance of counsel where counsel failed to see his client during the 109 days preceding trial, failed to interview or call important witnesses, failed to perfect an available insanity defense, concocted an irrational defense, and conducted himself in a bizarre if not contemptuous manner. M. S. Coleman, J., dissented stating that the procedures followed afforded defendant a fair trial, there was more than sufficient testimony to support a finding of guilt beyond a reasonable doubt, the defendant was found competent to stand trial and participated in planning trial strategy, there can be no claim that he was unable to comprehend the events at trial, and the conduct of the trial judge demonstrated the highest level of patience, fairness, and concern for justice and the Court can point to no specific error in the conduct of the trial. J. W. Fitzgerald, J., dissented stating that the defendant was not deprived of a fair trial in these extraordinary proceedings.

46 Mich App 395; 208 NW2d 187 (1973) reversed.

### DECISION OF THE COURT

1. HOMICIDE—MURDER—FAIR TRIAL—ASSISTANCE OF COUNSEL.

   A conviction of murder is reversed and the case remanded for new trial where 1) an examination of the entire record leaves the abiding conviction that the procedure followed did not accord defendant a fair trial, per T. G. KAVANAGH, C. J., and LEVIN, J., 2) defendant did not receive a fair trial because of ineffective assistance of counsel, per WILLIAMS, J.

### OPINION FOR REVERSAL

T. G. KAVANAGH, C. J., and LEVIN, J.

2. HOMICIDE—MURDER—FAIR TRIAL—NEW TRIAL.

   *A conviction of first-degree murder is reversed and a new trial granted where the Supreme Court is left with the abiding conviction that the procedure followed did not accord the defendant a fair trial (GCR 1963, 865.1[7]).*

### OPINION FOR REVERSAL

### WILLIAMS, J.

3. CRIMINAL LAW—ASSISTANCE OF COUNSEL—EFFECTIVE ASSISTANCE.

   *A defendant was deprived of a fair trial because of ineffective*

*assistance of counsel where assigned counsel failed to see his client during 109 days preceding trial, failed to interview or call important witnesses, failed to perfect an available insanity defense, concocted an irrational defense, and conducted himself in a bizarre if not contemptuous manner.*

4. CRIMINAL LAW—CONSTITUTIONAL LAW—ASSISTANCE OF COUNSEL.

*The Sixth Amendment guaranteeing a criminal defendant the right to counsel is applicable to the states by way of the Fourteenth Amendment (US Const, Ams VI, XIV).*

5. CRIMINAL LAW—ASSISTANCE OF COUNSEL—EFFECTIVE ASSISTANCE— CONSTITUTIONAL LAW.

*The right to counsel means at least the right to effective assistance of counsel.*

6. CRIMINAL LAW—ASSISTANCE OF COUNSEL—EFFECTIVE ASSISTANCE— COMPETENCE—DILIGENCE.

*Ineffective assistance of counsel may result not only from incompetence of counsel but also from lack of due diligence in conference and preparation.*

7. CRIMINAL LAW—ASSISTANCE OF COUNSEL—EFFECTIVE ASSISTANCE— SHAM TRIAL—MISTAKE OF COUNSEL.

*A defendant charged with a crime may claim he received a "sham" trial because he was represented by a bad lawyer or that he did not have a fair trial because of a serious mistake made by a good lawyer.*

8. CRIMINAL LAW—CONSTITUTIONAL LAW—FAIR TRIAL—ASSISTANCE OF COUNSEL—DILIGENCE—COMPETENCE.

*The basic constitutional requirement for assistance of counsel is that the quality of counsel does not fall below the minimum level necessary to a fair trial, which requires that counsel demonstrate both the capacity and diligence which constitute the constitutional right to effective representation.*

9. CRIMINAL LAW—NEW TRIAL—ASSISTANCE OF COUNSEL—JUDGES.

*When a new trial is required on the basis of incompetence of counsel a new judge who is not privy to the unfortunate preceding circumstances should have jurisdiction in order to give defendant the benefit of a completely clear record.*

DISSENTING OPINION

M. S. COLEMAN, J.

10. HOMICIDE—MURDER—EVIDENCE.

*There can be no claim that a conviction of first-degree murder*

*was contrary to the evidence where the record reveals more than sufficient testimony to support the trial judge's finding that defendant was guilty beyond a reasonable doubt.*

11. Criminal Law—Competence to Stand Trial.

*There can be no claim that a defendant was unable to comprehend the events at trial where he was found competent to stand trial and participated in planning trial strategy including a request for a bench trial, and where the judge several times afforded the defendant an opportunity to discharge his attorney or seek a mistrial and defendant indicated during trial that he wanted to proceed.*

Dissenting Opinion

J. W. Fitzgerald, J.

12. Criminal Law—Fair Trial.

*A conviction of murder should be affirmed where the record does not show that defendant was deprived of a fair trial.*

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *Robert F. Leonard,* Prosecuting Attorney, *Donald A. Kuebler,* Chief, Appellate Division, and *Joel B. Saxe,* Assistant Prosecuting Attorney, for the people.

*State Appellate Defender Office* (by *Dennis H. Benson),* for defendant on appeal.

T. G. Kavanagh, C. J. On September 28, 1970, an employee of a Flint baking company reported to the police that a van was illegally parked in the company's parking lot. The police came to investigate and found the defendant's wallet in the van as well as a palm print later shown to be that of the defendant. At the trial the baking company employee identified the defendant as the man he had observed in the van going through a lady's purse subsequently identified as belonging to Sally Ann Wright.

Sally Ann Wright's body was found in the Flint

River near a site described by defendant to his
mother. This site was some distance from the place
where the van had been parked. It was established
that Sally Ann Wright had been driving the van
on the day of her death.

Defendant's mother testified that on the day of
the crime her son came home and told her that he
had raped and killed a woman and that he had
thrown the body in the river and that he had left
the van in the baking company's parking lot. She
testified that the defendant asked her to help find
his wallet which he had lost. After riding past the
lot where the van had been abandoned and finding
the police already there, defendant asked his
mother to drive to the site where the body had
been thrown into the river in the hope that he
could recover his wallet there. Defendant's mother
persuaded him to see their family attorney and
then took him to a psychiatric clinic where defend-
ant had been undergoing preliminary interviewing
and testing.[1]

Through arrangements made by defendant's
mother, defendant was met and arrested by police
at the psychiatric clinic.

At the beginning of the trial defendant and his
appointed attorney, William J. Hayes, had some
disagreement over the fact that defendant wanted
to waive a jury and attorney Hayes did not.
Defendant requested different counsel, additionally
complaining that he had been in jail approxi-
mately 109 days and had not seen his attorney
until just a few minutes prior to trial. Attorney
Hayes explained that he had not visited defendant
because he had prepared his insanity defense by

---

[1] Defendant had allegedly committed other rapes and at the time of
the instant crime was out on bond pending trial on another rape
charge.

having weekly meetings with defendant's mother.
After a recess, the court convened again and the
defendant executed a written waiver of jury trial
and the court denied defense counsel's request to
withdraw since the event precipitating the dissat-
isfaction was no longer operative.

The next day defendant again expressed his
displeasure with appointed counsel. The court
abided by its earlier ruling denying defendant's
request that appointed counsel be withdrawn.
However, as the trial progressed, defendant ex-
pressed his complete satisfaction with Mr. Hayes.

The trial proceeded without incident until the
conclusion of the plaintiff's proofs. At that time
the defense began to establish a new theory of
defense. This theory, as it later developed, was
that the victim's husband, a probation officer, for a
monetary consideration and a promise to effect a
deal whereby defendant Strodder would receive no
more than a four-year sentence for the rape
charge for which he was awaiting trial and this
crime, induced defendant Strodder to assume re-
sponsibility for this murder and leave sufficient
identification about (print and wallet) whereby he
would be apprehended.

Defense attorney Hayes dramatically called the
victim's husband to the stand and accused him of
murdering his wife. Mr. Hayes then demanded:

"The procedures are unimportant. I am asking that
the whole record in this case be impounded, that no
further prosecutions go on in this county, that this
court and the prosecutor of this county be immediately
suspended from office, and that Mr. Mandric Strodder
immediately be set free. He is completely, absolutely
innocent of this charge."

Mr. Hayes continued:

"He's willing to live in this society as a free man if the people of the State of Michigan are willing to pick up his expenses for the rest of his natural life. Is that right Mr. Strodder?

*The Defendant:* Yes, sir."

When the trial court refused to accede to these requests, defense attorney and defendant refused to have anything to do with the proceedings and the court adjourned. The next day, June 29, 1971, the court appointed Mr. Ivor Jones co-counsel for defendant Strodder, at the same time indicating that the court would entertain a motion for mistrial. Defendant said that he wanted Mr. Hayes to continue as his attorney and after the judge expressed his doubts about Mr. Hayes's sanity stated that he did not think it necessary that Mr. Hayes submit to psychiatric examination. The court agreed to adjourn the trial for a week in order to give attorney Jones a chance to familiarize himself with the case.

The court arranged to have a psychiatrist observe defense counsel at trial. The psychiatrist testified that in his opinion defense counsel was able to perform his duty. The court later read into the record a letter from attorney Hayes's personal physician indicating, "No unusual psychiatric manifestations were noted by me. He has attended my office regularly and continues to show steady improvement". The last comment referred to a physical condition for which Mr. Hayes was being treated.

Throughout the balance of the trial, defense counsel was incredibly abusive to the trial judge, the prosecutor, and other public officials, but the trial judge said that he believed he could freely try the facts and issues without prejudice to either side. Defense counsel Hayes, at the conclusion of

the trial, apologized for his attacks on the judge and expressed his confidence that the judge would make an honest decision.

The trial judge, exhibiting unusual patience, repeatedly offered defendant the opportunity to move for mistrial, all of which were declined by defendant and his attorney, indicating a complete willingness to proceed to judgment with Judge Elliott.

The judge found the defendant guilty and the Court of Appeals affirmed.

We have carefully considered each of the matters urged on appeal.

They were all considered by the Court of Appeals, and without expressly approving that Court's treatment of the various issues, we are not disposed to say their holdings were erroneous in any particular.

Nonetheless from our examination of the entire record we are left with the abiding conviction that the procedure followed here did not accord the defendant a fair trial.

For this reason, without impugning the ability, integrity or good will of the prosecutor, trial judge or Court of Appeals we reverse the conviction and order a new trial, pursuant to GCR 1963, 865.1(7).

Levin, J., concurred with T. G. Kavanagh, C. J.

Williams, J. *(to reverse)*. The issue in this first-degree murder case is whether defendant was deprived of a fair trial because of ineffective assistance of counsel. Counsel failed to see his client during the 109 days preceding trial, failed to interview or call probably important witnesses, failed to perfect an available insanity defense, concocted an

irrational defense, and conducted himself in a bizarre if not contemptuous manner.

This opinion would reverse because of ineffective counsel for failure of adequate competence and adequate diligence to assure a fair trial.

## I —FACTS

The facts of the instant case indicate the trial judge exhibited unusual patience and heroically attempted to try the facts and issues without prejudice to either side in the midst of a series of amazing attacks on his credibility and honesty. On the other hand, defense counsel abruptly changed course in midstream, and instead of presenting a planned insanity defense, dramatically attempted to pin the crime on the victim's husband, during the course of which he was irrational and abusive of the judge.

Defendant Strodder, who was undergoing psychiatric interviewing and testing pending his trial on a rape charge, was arrested and charged with raping and killing another woman in 1970.

Strodder was represented by appointed counsel William Hayes during a competency hearing, the preliminary examination and trial. Hayes filed notice of his intention to use the defense of insanity and indicated he would use only one witness.[1]

Almost as soon as trial began, defendant objected that he was not prepared as he had not seen his attorney during the approximately 109 days preceding the opening of trial.

Counsel contended he had been having weekly conferences with defendant's mother concerning the case, and had used that information to prepare

---

[1] He later attempted to use two additional witnesses, but the trial court refused permission because of lack of notice.

the insanity defense.[2] Counsel also noted that defendant had made no request to see him at the preliminary examination.

However, later on at trial, Hayes admitted that he had not seen his client because he was afraid of him.

"I bought the program, and I bought the theory that Strodder's nuts. In fact, being perfectly candid with you, I was scared stiff every time Strodder talked to me about anything. I figured maybe the guy was going to go off his tree, and with his propensities who knows what he might do. You'll notice he has a fond eye for Mr. Black, though." (Mr. Black was the prosecutor.)

Still later, he also admitted that the lack of contact may have adversely affected his client's case.

"No, probably Strodder could have beaten the rap, and I suggest to you that I'm probably more at fault than anybody else, because as you pointed out right in the beginning of this trial, if I had visited him in those 109 days very possibly there might have been a different deal. I don't know."

To the court's credit, Judge Elliott indicated such negligence on the part of Hayes was "outrageous". However, when Hayes tried to use the court's displeasure at this failure to properly prepare as an excuse to withdraw from the case, the judge refused. This was only the beginning of an

[2] Counsel's close work with defendant's mother did not, however, apparently result in a relationship in which they both worked hand-in-hand for the benefit of defendant. Counsel pleaded at one point:

"I wish to renew my motion to withdraw from this case because I feel if the advice of counsel is just shunted aside, then I don't think I am performing the best function I could possibly do in representing my client, because I think there's a conflict or potential conflict of interest with respect to myself and Mrs. Simmons [appellant's mother] and her interest in this case."

apparent tug of war on the part of both Strodder
and Hayes during the first part of the trial to be
rid of each other.

At one point, defendant pleaded:

"If he's going to represent me, I want somebody here
fighting my case."

Apparently, the cause of this controversy was
that defendant wanted to waive a jury trial while
counsel did not. In the end, defendant prevailed
and jury trial was waived.

Although Hayes at this point began to get along
better with Strodder, with defendant expressing
complete satisfaction with counsel, his relations
with the trial judge deteriorated. Things went
downhill when, after the court gave him permis-
sion to hire an investigator, Hayes chose Matthew
Buder, a former Genesee County attorney who had
been disbarred and imprisoned as a result of un-
professional conduct. Several altercations occurred
between defense counsel and judge, based on the
judge's belief that Buder was acting as an informal
counsel on the case.[3]

---

[3] For example:

"*Mr. Black:* Let the record reflect he's conferring with Mr. Buder
again, your Honor.

"*The Court:* Yes, he has throughout the course of the last couple of
days, and I would I expect want to indicate that my failure to make
any comment is in no way a reflection of approval of obtaining any
legal advice from Mr. Buder, if that is in fact what occurred.

"*Mr. Hayes:* No. Wait a minute. So the record will be very clear,
the court at one point previously mentioned when I went over to talk
with Mr. Buder that the record should reflect this as if it's an
extraordinary procedure. Mr. Buder has been engaged by me as an
investigator in this case. I think it would be a most normal procedure
for me to inquire of Mr. Buder with respect to matters of any nature
whatsoever, and I'm not suggesting that Mr. Buder gives me legal
advice, but as an investigator he has participated in this case and I
call on his assistance for any number of things, which I don't think is
within the province of this court to inquire about.

"*The Court:* I neither am inquiring about it nor approving it.

"*Mr. Hayes:* Are you disapproving?

The courtroom began to take on the appearance of a television drama when Hayes apparently abandoned the insanity defense and suddenly one morning requested that the husband of the alleged victim take the stand. B. James Wright, the requested witness, had not been indorsed. Hayes explained his unusual request for the appearance by claiming:

"Mr. B. James Wright strangled his wife. Will you get up and testify, sir?"

When his examination did not result in a Perry Mason-type confession blurted from the stand,

"*The Court:* Well, do you really want me to answer that?

"*Mr. Hayes:* Certainly.

"*The Court:* I think it is necessary to observe that Mr. Buder is a person who has been disbarred, and his professional conduct resulted in his being imprisoned at one time, and I don't—I have not inquired into the depth of your conferences with him, but if it's to obtain legal advice from him, I think probably I would disapprove of that."

Buder's presence appeared to exacerbate the courtroom relationship between defense counsel and prosecutor as well. Apparently counsel's irascibility was reflected in his relationship with the prosecutor:

"*Mr. Hayes:* Why don't we have the record reflect that the prosecutor has people out in the hall coming in to discuss something with him.

"*Mr. Black:* I'm discussing something with Detective Gerald Dickenson and another officer that walked up.

"*Mr. Hayes:* Fine. Let the record so reflect. Whenever I talk to my investigator, the record reflects it.

"*Mr. Black:* My investigator is not Matt Buder.

"*Mr. Hayes:* My investigator has more integrity than yours will ever have.

"*Mr. Black:* I doubt that, Mr. Hayes.

"*Mr. Hayes:* We don't lie.

"*Mr. Black:* Oh really? You've changed.

"*Mr. Hayes:* You ever say that outside of the court, buddy, and you'll see what change I'll have.

"*Mr. Black:* Any time.

"*Mr. Hayes:* Getting back to the subject matter of the case—I'm sorry for that outburst, your Honor.

"*The Court:* I think you should be, and I didn't intervene because I think the record should show the kind of conduct that has been frequent throughout the course of this trial."

Hayes wished to review the contents of the police file. The prosecutor objected, but he contended:

"The procedures are unimportant. I am asking that the whole record in this case be impounded, that no further prosecutions go on in this county, that this court and the prosecutor of this county be immediately suspended from office, and that Mr. Mandric Strodder immediately be set free. He is completely, absolutely innocent of this charge."

He refused to explain his actions further, but instead maintained:

"I ask that Mr. Strodder be reinstated on his bond. He is willing and has authorized me to say he's willing to compromise this case as follows:

"He's willing to live in this society as a free man if the people of the State of Michigan are willing to pick up his expenses for the rest of his natural life. Is that right Mr. Strodder?"

The Defendant:

"Yes sir."

Shortly thereafter counsel announced that he did not want to participate "any further in these proceedings", and answered in the negative when the court asked "are you going to continue with the defense of this matter?"

*"The Court:* I'm going to order you to continue with the defense of this matter.

*"Mr. Hayes:* We have nothing further to say. Is that right, Mr. Strodder?

*"The Defendant:* Yes, sir, Mr. Hayes. * * *

*"The Court:* Am I correct Mr. Hayes that you're telling me that you are refusing the order of the court to continue with the defense of this matter?

"*Mr. Hayes (to the defendant):* Don't talk about the case any further."

Following a recess, the court offered Strodder a mistrial, but the parties opted to continue. The next day the court approved Ivor Jones as co-counsel. The judge then requested Strodder's permission to perform a psychiatric examination of counsel "because it seems to me that the events of yesterday raised some question of whether Mr. Hayes is in possession of his reason". The court, however, was later assured by Hayes' co-counsel and a psychiatrist who observed counsel in the courtroom that although Hayes was suffering from stress and was deeply involved in the case, there was no question of an unstable mental condition. Although he had some ideas which were delusionary, he appeared to be mentally competent. This opinion was echoed in a letter from Hayes' personal physician.

The trial proceeded relatively calmly until the judge became aware that Hayes was going to go to extraordinary lengths to embarrass the court.[4] For example, defense counsel requested that the judge disqualify himself because he had been acquainted with both the victim's husband and defendant's

---

[4] This followed counsel's impassioned speech in support of his investigator:

"It appears to me that this court is deliberately going out of its way to condemn Mr. Buder who honestly and decently served whatever term of penitentiary confinement with respect to any crimes he committed. I want to say if this is going to be an issue, we're going to find out who has the Calpurnian standard, who is he who is above suspicion. We will investigate, and I promise you we will, every participant in this case with respect to criminal records and criminal behavior, and I want the record to reflect that I personally will go on record and I will announce, and I don't care if it's God himself that has a record, everybody's record, so that this record will reflect Mr. Buder as my investigator who has done an outstanding job is being condemned for helping in seeing that Mr. Mandric Strodder gets justice. And I think it's outrageous that this court should stoop to the level it has done in terms of condemning him."

stepfather. The request was made despite the fact that the judge had himself offered to step down before the trial had even begun. That offer had been refused. Now the judge indicated he did not think this should be sufficient to disqualify him. He added, frankly, that such attempts by the defense did not

"endear either Mr. Hayes or Mr. Buder to me, and I will continue on this case as the trier of fact if Mr. Strodder desires me to. But if there's to be any question about my being an impartial trier of fact, I want it to be raised now and not after there's been a verdict in this case, if it happens that the verdict that I finally announce would be against Mr. Strodder. I have no way of knowing at this time what the verdict will be."

Strodder and counsel again refused the court's offer to move for a mistrial.

Further disagreements between court and counsel occurred when Hayes' request for adjournment while he went on vacation for a few days was first denied, then granted, with Hayes first excusing, and then calling the same witnesses,[5] and when

---

[5] *"The Court:* Yes, it seems to me that this is a perfectly apparent effort on the part of Mr. Hayes to make it impossible to have an expeditious completion of the trial by having the witnesses that he wishes to call appear here today, * * *

*"Mr. Hayes:* That's right. Look I've tried to cooperate with you, Mister Elliott, and you are—

*"The Court:* Judge Elliott.

*"Mr. Hayes:* Judge Elliott. That the electorate did, not me, I'll tell you.

*"The Court:* That could be.

*"Mr. Hayes:* Never and I hope that electorate never makes the mistake again.

"But regardless, they can confer office, they can't put wisdom on the bench.

"I want to tell you this: I will cooperate, and I have cooperated in every way. I have gone to the war in this case, and I'll go to the war forever in this case. I want it—I do not ever wish you to judge me and my motives, and when you suggest that I would have been so

Hayes attempted to call the judge as witness. Hayes had other troubles with witnesses when he decided to retain the insanity defense after all.

Hayes learned in the course of examination of his sole expert witness, a psychiatrist who had examined defendant in 1968, that defendant had been tested and examined at a psychiatric clinic in 1970. When the court sustained the prosecutor's objection to his attempt to subpoena these witnesses because they were not listed on the pretrial notice, Hayes was left with one witness. He apparently did not follow up the prosecution witnesses either. When the court refused his objections to the testimony of two doctors from the Center for Forensic Psychiatry as prosecution rebuttal witnesses, he set off to seek a writ of superintending control on the issue of their competency to testify, leaving co-counsel, who was unfamiliar with any of their findings, to perform that cross-examination. Although he had known since June 16th that the two would testify, it was not until July 29th, the date they actually testified, that he made the trip to Lansing.

Upon closing argument, defense counsel acknowledged that things might have gone differently had he visited Strodder before trial.

"*Mr. Hayes:* * * * You know I haven't given you much credit, Judge, but when I look back on the whole thing, perhaps if I had visited him in those 109 days he might have opened up to me. It's doubtful when I hear Mr. Ennis say how tight-lipped he was, further doubtful when even after I pleaded five times to get out of this case I asked him 'Under those circumstances, do you want me to represent you?', and he says 'If you do what you're supposed to do, yes. If you're not going to do what you're supposed to do, no,' and I immediately

dishonorable as to consider myself before I would consider that man, I want to tell you that it's not true and it will never be true."

think the guy is out of his skull, he talks in riddles. Now I know what that meant; if I'm part of the fix, if I go along with the deal, do the job. * * * "

Counsel, although claiming that so much of the trial "appears to me a collusive effort on behalf of Mr. Wright and the Prosecutor to protect Mr. Wright from even investigation", and that "[s]o much of our trial procedure has really been a game", apologized.

"Now a final point. I want to apologize to the Court for anything I have done, and I know I've done some things that have been personally offensive to the Court. I did anything and everything I did with my conscience to the best interest of my client as I saw it.

"I do not wish to exonerate myself of some of the misbehavior I know I engaged in; that is, on a number of occasions I was rude to the Court, I did yell and shout, I did say things that I shouldn't have. I apologize to you personally; I really don't mean to do that, and I'm really sorry.

"I know I have done another thing that is probably unconscionable, and that is I may well have ruined things for Mandric Strodder for the rest of his life. Because of the extraordinary nature of the case and the way it's progressed, it's very likely that somebody will say 'Well, he had incompetent counsel, and let's get him a new trial.' But they need not try him anew, they've got other charges pending against him, so he can be packed away anyway. If I did that to him, I'm sorry."

The trial court found the defendant guilty as charged of first-degree murder.

Said the judge,

"I do not have the slightest doubt of his guilt of this murder in the first degree. There is not a speck of evidence in support of the transparent and inherently

unbelievable fabrication he recently concocted at the invitation of his lawyer."

Mandric Strodder was sentenced to life imprisonment at hard labor in solitary confinement.

The Court of Appeals affirmed, holding that defendant had expressed satisfaction with counsel on numerous occasions, that no prejudice arose from lack of consultation before trial, and that numerous incidents, including the choice not to move for mistrial were questions of trial strategy, which, if erroneous, "is not a basis for finding a denial of effective counsel". 46 Mich App 395, 403; 208 NW2d 187 (1973).

## II —Incompetence of Counsel

### A. The Relevant Law

The Sixth Amendment guarantees a criminal defendant the right to counsel and is applicable to the states by way of the Fourteenth Amendment. *Gideon v Wainwright,* 372 US 335; 83 S Ct 792; 9 L Ed 2d 799; 93 ALR2d 733 (1963). The right to counsel means at least the right to effective assistance of counsel. *Powell v Alabama,* 287 US 45; 53 S Ct 55; 77 L Ed 158; 84 ALR 527 (1932). The validity of the adversary system and the legal and ethical requirements of the profession obligate the attorney to provide diligent and skillful representation.

No single standard for determining whether counsel was in fact effective has received universal acceptance. At first, based on the concept that the Sixth Amendment guarantees no more than the formal appointment of competent counsel,[6] the

---

[6] "It is clear that once competent counsel is appointed his subsequent negligence does not deprive the accused of any right under the

approach was that to show ineffective assistance of counsel, one had to show the proceedings amounted to a "sham trial". The entire representation of defendant must show that:

"[T]he trial was a farce, or a mockery of justice, or was shocking to the conscience of the reviewing court, or the purported representation was only perfunctory, in bad faith, a sham, a pretense, or without adequate opportunity for conference and preparation." *Williams v Beto,* 354 F2d 698, 704 (CA 5, 1965).

See also, *People v Husband,* 50 Mich App 46; 212 NW2d 746 (1973); *People v Greene,* 42 Mich App 154; 201 NW2d 664 (1972).

Dissatisfaction with this as the sole approach appeared in the law reviews[7] and the case law[8] as it became apparent that guaranteeing counsel without in turn assuring adequate performance would defeat the ultimate purpose of appointing counsel in the first place, that of giving defendant

Sixth Amendment. All that amendment requires is that the accused shall have the assistance of counsel. It does not mean that the constitutional rights of the defendant are impaired by counsel's mistakes subsequent to a proper appointment." *Diggs v Welch,* 80 US App DC 5, 6; 148 F2d 667, 668 (1945) (footnotes omitted).

An agency theory in which the client was held responsible for the errors of his attorney appeared in some of the cases as a means of preventing defendant from enforcing ineffective representation. Bines, *Remedying Ineffective Representation in Criminal Cases: Departures from Habeas Corpus,* 59 Va L Rev 927, 929, n 10 (1973).

[7] *See, e.g.,* Waltz, *Inadequacy of Trial Defense Representation as a Ground for Post-Conviction Relief,* 59 Nw U L Rev 289 (1964); Bines, *Remedying Ineffective Representation in Criminal Cases: Departures from Habeas Corpus,* 59 Va L Rev 927 (1973).

[8] The District of Columbia circuit, for example, which had produced the *Diggs* decision, cited *supra* fn 6, held in *Bruce v United States,* 126 US App DC 336; 379 F2d 113 (1967), and reaffirmed in *Scott v United States,* 138 US App DC 339, 340; 427 F2d 609, 610 (1970).

"The appropriate standard for ineffective assistance of counsel * * * is whether gross incompetence blotted out the essence of a substantial defense."

a fair trial.[9] Rejecting "the low standard of effectiveness required by *Williams v Beto,* which would do no more than prevent the trial from becoming 'a farce, or a mockery of justice' ", *West v Louisiana,* 478 F2d 1026, 1033 (CA 5, 1973), the Fifth Circuit returned to the standard it had announced in *MacKenna v Ellis,* 280 F2d 592, 599 (CA 5, 1960):

" 'We interpret the right to counsel as the right to effective counsel. We interpret counsel to mean not errorless counsel, and not counsel judged ineffective by hindsight, but counsel reasonably likely to render *and rendering* reasonably effective assistance.' " (Emphasis in original.) *West v Louisiana,* 478 F2d 1026, 1033 (CA 5, 1973).

Other courts have interpreted this approach as did the West Virginia Supreme Court of Appeals, requiring defendant to prove by a preponderance of the evidence that his or her attorney did not possess "the normal customary skill and knowledge of the law. This test, which has characteristics in common with the malpractice standard applied to physicians and other professions, has worth in that it provides the court with measurable indicia with which to judge and compare counsel's efforts." *State v Thomas,* — W Va —; 203 SE2d 445 (1974).

We think this search for a fairer objective standard than "sham trial" alone was greatly advanced by the Sixth Circuit in *Beasley v United*

---

[9] The United States Supreme Court mandated judges to "strive to maintain proper standards of performance by attorneys who are representing defendants in criminal cases in their courts" because "defendants cannot be left to the mercies of incompetent counsel," *McMann v Richardson,* 397 US 759, 771; 90 S Ct 1441; 25 L Ed 2d 763 (1970). Advice to clients, the court held, must be "within the range of competence demanded of attorneys in criminal cases". 397 US 759, 771.

*States,* 491 F2d 687 (CA 6, 1974). This case also demonstrates the problem of utilizing the "sham trial" approach alone.

In *Beasley,* the district court had found defense counsel guilty of a long list of incompetencies and lack of diligence,[10] but nonetheless held that defendant had not been deprived of his right to the effective assistance of counsel because the trial had not been rendered " 'a farce and a mockery, shocking to the court.' " 491 F2d 687, 692.

The Sixth Circuit then rejected the subjective "sham trial" standard which had produced this incongruous result "except as it may be considered a conclusory description of the objective standard we adopt". 491 F2d 687, 696. As ably detailed by Judge Celebrezze, the Court outlined this approach:

"We hold that the assistance of counsel required under the Sixth Amendment is counsel reasonably likely to render and rendering reasonably effective assistance. It is a violation of this standard for defense counsel to deprive a criminal defendant of a substantial defense by his own ineffectiveness or incompetence. * * * Defense counsel must perform at least as well as a lawyer with ordinary training and skill in the crimi-

---

[10] The district court first found that defense attorney had been incompetent because he called a witness whose appearance "made sense only in the context of a bizarre defense strategy which the District Court characterized as 'highly implausible.' " 491 F2d 687, 690. Counsel also persuaded the defendant to waive his right to a jury trial without informing him that the trial judge had read a prejudicial statement about him that could not have been introduced at trial. Counsel never requested an independent test of the fingerprint evidence although the trial judge ordered the government to pay for one. He did not call several res gestae witnesses who could have testified they could not identify defendant because he believed that it was the government's responsibility to subpoena all res gestae witnesses, the practice in Michigan state courts but not in the Federal system. The district court also found counsel was incompetent because he failed to interview all but one of the res gestae witnesses and made only a cursory investigation before trial. He was also "suffering from pain shortly before the trial". 491 F2d 687, 691.

nal law and must conscientiously protect his client's interest, undeflected by conflicting considerations. * * * Defense counsel must investigate all apparently substantial defenses available to the defendant and must assert them in a proper and timely manner. * * *

"It is a denial of the right to the effective assistance of counsel for an attorney to advise his client erroneously on a clear point of law if this advice leads to the deprivation of his client's right to a fair trial. * * * Defense strategy and tactics which lawyers of ordinary training and skill in the criminal law would not consider competent deny a criminal defendant the effective assistance of counsel, if some other action would have better protected a defendant and was reasonably foreseeable as such before trial. * * * If, however, action that appears erroneous from hindsight was taken for reasons that would appear sound to a competent criminal attorney, the assistance of counsel has not been constitutionally defective." (Citations omitted.) 491 F2d 687, 696.

*Beasley* appears to us as a good explication of the lack of competency part of an objective ineffective assistance of counsel rule. The other part must relate to lack of due diligence.

*Beasley* held "that the petitioner did not receive the effective assistance of counsel before and during trial". 491 F2d 687, 696. While the opinion spoke largely to questions of competency, this reference must also include the district court's findings of failure "to interview any *res gestae* witnesses before trial" except one poor one, and of counsel conducting "no more than a cursory investigation of the facts prior to trial". 491 F2d 687, 691.

Lack of due diligence bearing on ineffectiveness of counsel has been recognized in many of the Federal cases.[11]

---

[11] "Prior to trial an accused is entitled to rely upon his counsel to make an independent examination of the facts, circumstances, plead-

Lack of due diligence was recognized as a factor to be considered in ineffectiveness of counsel by this Court. In *Holt v State Bar Grievance Board,* 388 Mich 50; 199 NW2d 195 (1972), we noted that "Canon 6 requires generally that 'A Lawyer Should Represent a Client Competently.'" 388 Mich 50, 63. According to Disciplinary Rule 6-101(A)(2), Failing to Act Competently,

"(A) A lawyer shall not:
"(2) Handle a legal matter without preparation adequate in the circumstances." 388 Mich 50, 63.

In our opinion, the most generally cited Michigan case in relation to ineffective assistance of counsel, *People v Degraffenreid,* 19 Mich App 702; 173 NW2d 317 (1969), is not inconsistent with the rule here developed. While it is often cited as a "sham" rule case,[12] when the whole opinion is

ings and laws involved and then to offer his informed opinion as to what plea should be entered." *Von Moltke v Gillies,* 332 US 708, 721; 68 S Ct 316; 92 L Ed 309 (1948).

*See, e.g., White v Ragen,* 324 US 760; 65 S Ct 978; 89 L Ed 1348 (1945) (prima facie case for habeas corpus relief resulted from appointed counsel's failure to confer with his client until the day of trial, to do anything for petitioner unless the prisoner had money, and refusal to call a requested witness); *King v Beto,* 429 F2d 221 (CA 5, 1970) (habeas corpus granted where counsel did not meet with client in seven months prior to trial, failed to interview or investigate witnesses, did not move to suppress questionable evidence, and made no effort to obtain a new trial or appeal); *Wilson v Rose,* 366 F2d 611 (CA 9, 1966) (habeas corpus justified where counsel did not discuss the facts of the case or possible defenses with his client, failed to pursue discovery, failed to advise accused of the nature and consequences of a guilty plea, while guaranteeing his client that he would "get probation" when probation was prohibited for the offense of which he was accused); *Schaber v Maxwell,* 348 F2d 664 (CA 6, 1965) (counsel failed to submit plea of not guilty by reason of insanity in writing, thereby depriving him of his only defense, because under Ohio law, he was therefore conclusively presumed to have been sane at the time of the offense).

[12] *See, e.g., People v Husband,* 50 Mich App 46; 212 NW2d 746 (1973); *People v Holcomb,* 47 Mich App 573; 209 NW2d 701 (1973); *People v Greene,* 42 Mich App 154; 201 NW2d 664 (1972).

read, it is considerably broader.

*Degraffenreid* dealt with the two different aspects of the problem of effective representation by counsel that this opinion deals with. First, as to incompetency there is the familiar analysis of "sham" trial. However, at a different point in his *Degraffenreid* opinion, Justice, then Judge Levin, spoke more broadly on the question of competence in the light of a fair trial. He noted that, "Where the lawyer's mistake is of such serious proportion that it may have been decisive", a new trial may be appropriate. 19 Mich App 702, 716.

Thus, under *Degraffenreid,* defendant may claim he received a "sham" trial because he was "represented by a bad lawyer", 19 Mich App 702, 717, or may request "a new trial because of a serious mistake made by a good lawyer". 19 Mich App 702, 717.

As to the second, or diligence, standard, the very *Williams v Beto* language setting forth the "sham" trial rule, includes the second or diligence standard as well, "without adequate opportunity for conference and preparation". 354 F2d 698, 704, cited at 19 Mich App 702, 710. Thus many of the points in this opinion were at least touched upon in *Degraffenreid.*

We recognize, of course, that effective assistance of counsel means something other than successful assistance. *Mitchell v United States,* 104 US App DC 57; 259 F2d 787 (1958). But, as Chief Justice Burger's arguments have helped focus the attention of our profession on the competence of trial advocates,[13] so we on our Court must ensure the

---

[13] *E.g.,* Burger, *The Special Skills of Advocacy: Are Specialized Training and Certification of Advocates Essential to Our System of Justice?* 42 Fordham L Rev 227 (1973).

basic constitutional requirement that the quality
of counsel does not fall below the minimum level
necessary to a fair trial. That minimum level
requires that counsel demonstrate both the capac-
ity and diligence which constitute the constitu-
tional right to effective representation.[14]

---

[14] The Wall Street Journal, February 24, 1975 at 1, col 1, featured
several interviews with judges and attorneys which reflected a nation-
wide concern with the problem. We quote, with approval, this portion
of the article which focuses on some reasons for reluctance of courts
to move in this area, and on the movement which has begun.

"Judge [Walter H.] McLaughlin [Boston] says he has sometimes
'saved the case' by allowing it to be reopened. But he feels that makes
a judge look too much like an advocate; so, as a rule, he won't
interfere unless an 'absolute injustice' would result. 'If someone wants
to hire an idiot for a lawyer,' he says, 'then as far as I'm concerned
they've got an idiot.'

"But the client often faces frustration because he doesn't realize his
attorney is incompetent until the middle of a trial, when it's too late.
'It's like finding out your doctor doesn't know how to operate when
he's already got you open', says Merrill L. Hartman, a trial lawyer in
Dallas.

"Sometimes the loss is more than money. A New York lawyer, for
example, recalls trying to overturn the murder conviction of a man
whose trial lawyer failed to bring out some facts pertinent to the
question of motive. For example, the first lawyer didn't raise the
point that the defendant didn't know the victim and had no de-
monstrable connection with him. Nor did he point out that there was
nothing to link the murder weapon with the accused.

" 'In all, I found seven holes in the prosecutor's evidence that were
never argued,' says the New York attorney. Nevertheless, the appeals
court refused to order a new hearing and the man went to prison.

"Ironically, it's nearly impossible to persuade judges to change a
ruling on the ground that a client's counsel was incompetent. In most
jurisdictions, the complaining client must show that he was denied a
fair trial. Usually, that means he must prove that his lawyer's
performance turned the trial into 'a farce and a mockery of justice'.
Judges say the standard of proof must be high to prevent criminals
from automatically using claims of slipshod legal defense as excuses
to challenge their convictions.

"Still, some courts are moving to ease the client's burden. In 1973,
the U. S. Appeals Court for the District of Columbia established a less
stringent standard in reviewing the conviction of one Willie DeCoster
for aiding and abetting an armed robbery and assault. It said a client
shouldn't have to prove he was denied fundamental fairness, but only
that he didn't get 'reasonably competent' assistance, which the ap-
peals court said is required by the Constitution's right-to-counsel
provisions. If that can be shown, the appeals court said, then the
prosecutor assumes the burden of proving the defendant wasn't hurt
by his counsel's incompetence.

## B. Performance of Counsel

We hold that Mandric Strodder did not receive a fair trial because of ineffective assistance of counsel. An examination of the record in the instant case demonstrates the applicability of the proposed test.

### 1. Failure of due diligence

Counsel's incompetence in the instant case was manifested by many of the same factors condemned by the district court in *Beasley, supra,* fn 10.

He did not interview or call all possible witnesses and, in fact, did not discover most of them until in the midst of trial, when it was, in fact, too late.

He failed to meet with his client during the period before trial and, consequently, did not develop a coherent strategy with defendant, did not learn the details of defendant's history, and was unable to construct a viable defense, when there was, in fact, ample evidence available had he assiduously prepared.

### 2. Failure of competence

The *Beasley* Court outlined some of the hallmarks to which an appellate court should look when analyzing this aspect of the test. Counsel must be "reasonably likely to render and render-

"The appeals court ordered further hearings to determine if Mr. DeCoster was inadequately represented under this new standard. In so doing, the court noted that his defense counsel had been late in filing a bond-review motion and then had filed it in the wrong court, and that he had agreed to go to trial while acknowledging that he wasn't prepared. The court also said the attorney had neglected to check properly the outcome of separate cases against Mr. DeCoster's alleged accomplices." *Id,* at 19, col 6.

ing reasonably effective assistance". 491 F2d 687, 696.

Counsel must not "deprive a criminal defendant of a substantial defense by his own ineffectiveness or incompetence." 491 F2d 687, 696.

"Defense counsel must investigate all apparently substantial defenses available to the defendant and must assert them in a proper and timely manner." 491 F2d 687, 696.

The insanity defense was a viable approach, and counsel himself recognized this when he returned to it following his attack on the victim's husband. However, attorney Hayes did not uncover all witnesses, did not fully learn defendant's psychiatric history, did not call all witnesses (partly because of his later discovery of two witnesses), and did not adequately cross-examine the prosecution's rebuttal witnesses. This left defendant's only realistic defense in a shambles around his attorney's feet.

"Defense strategy and tactics which lawyers of ordinary training and skill in the criminal law would not consider competent deny a criminal defendant the effective assistance of counsel." 491 F2d 687, 696.

In the instant case, defense counsel neither investigated the viable defense he planned to present, nor the controversial one he chose to present. Additionally, his conduct was neither proper nor uncontemptuous. Witnesses he did call, including the victim's husband and the judge, could only be rationalized by a bizarre and implausible defense strategy. He used the court-financed investigator in a manner disapproved by the court.

Little more appears to be necessary to say about this than that undoubtedly a lawyer of ordinary

training and skill in the criminal law would not use the defense strategy and tactics which outraged the court in the instant case.

Thanks to the heroic efforts of the judge, the trial itself was saved from becoming a "farce" or "mockery". However, the strain the same circumstances imposed on the adversary process and trial procedure, combined with the failure to present a substantial defense, created a situation constituting ineffective assistance of counsel.

## C. Defendant's Expression of Approval

That defendant manifested his approval of counsel is indicative, but not dispositive. This is particularly true when dealing with a defendant of limited capacity, but in general it is entirely too much to expect an untrained lay person in defendant's shoes to know when counsel is being ineffective by legal standards.

We do not urge a rule whereby counsel can be dismissed because of insignificant disagreements between attorney and client. However, we do not wish to insist on retaining a situation which consists of a continuing pattern of disagreement, agreement, disagreement, agreement. Such a situation is injurious to any relationship, but certainly doubly so to the kind of intimate association which is the hallmark of any successful attorney-client relationship. Of itself, this would not be enough for us to find error, but combined with other factors it is. Further, it is unfair to insist that the approval of his counsel's performance by a person whose competence was at issue should be construed to outweigh other factors relating to his attorney's performance.

The United States Supreme Court held the right

to effective assistance of counsel to be so basic that every reasonable presumption would be indulged against waiver of this right. *Glasser v United States,* 315 US 60; 62 S Ct 457; 86 L Ed 680 (1942). In addition, the harmless error standard is inapplicable when dealing with so basic a right.

"The right to have the assistance of counsel is too fundamental and absolute to allow courts to indulge in nice calculations as to the amount of prejudice resulting from its denial." 315 US 60, 76.

Counsel would have us believe that the judge should have disqualified himself because of bias. On the contrary, the record is filled with a rather heroic effort on the part of the judge to prevent himself from being influenced by the personal attacks and unorthodox behavior of counsel. Any indication we have on the record is that the attorney was in fact given almost every opportunity that he requested to present his case, including the appointment of an investigator, full and complete examination of the victim's husband, and even an offer of proof concerning unindorsed witnesses. However, it would be better if the judge did not participate upon retrial, but this is not because of any unjudicial behavior during trial. Rather, when a new trial is required on the basis of incompetence of counsel, it seems well that a new judge who was not privy to the unfortunate preceding circumstances should have jurisdiction in order to give defendant the benefit of a completely clear record.

We hold that an examination of the record indicates that Mandric Strodder did not receive a fair trial because of ineffective assistance of counsel. The Court of Appeals is reversed and the case is remanded to the circuit court for a new trial. As

for other issues claimed by defendant, we do not consider them at this time.

M. S. Coleman, J. *(dissent)*. My examination of this case fails to leave me with an abiding conviction that the procedures followed deprived defendant of a fair trial. I would affirm.

There can be no claim that Judge Elliott's verdict was contrary to the evidence. The record reveals more than sufficient testimony to support the trial judge's finding that defendant was guilty beyond a reasonable doubt in this murder case.

There can be no claim that defendant was unable to comprehend the events at trial. He was found mentally competent to stand trial. He participated in planning trial strategy, including the request for a bench trial. Judge Elliott several times afforded defendant an opportunity to discharge his attorney or seek a mistrial. Defendant indicated during trial that he wanted to proceed.

There certainly can be no reversible error in Judge Elliott's conduct. It was impeccable, demonstrating the highest level of patience, fairness and concern for justice. The Court said he exhibited "unusual patience". The Court of Appeals commended him "for his conduct and in retaining his composure and objectivity under the most trying circumstances".

The judge was in the untenable position of having good reason to believe that he would be reversed if he dismissed counsel over defendant's objection. He therefore pursued a wise course in appointing co-counsel to ensure a fair trial.

The judge also was faced with good reason to believe that his declaring a mistrial over objection of the defendant would lead to a finding of double jeopardy upon review.

All admit that he conducted himself admirably and patiently heard the case to the end. The defendant received exactly what he requested. I cannot see where the judge erred. In my opinion he is greatly to be commended.

The Court of Appeals, in an excellent analysis could find no reversible error in the conduct of this trial. This Court can point to no specific error. Defendant should stand properly convicted of this murder.

The Court of Appeals should be affirmed.

J. W. FITZGERALD, J. *(for affirmance).* Our Olympian view of the specter of justice under fire on the courtroom battle front suggests repugnance at the sulfurous odor and frightful din below. Resisting the subtle siren of suggestion, I share Justice M. S. COLEMAN's view that defendant was not deprived of a fair trial in these extraordinary proceedings. I would adopt the excellent opinion of Judge DANHOF, writing for a unanimous panel of the Court of Appeals, at 46 Mich App 395; 208 NW2d 187 (1973).

SWAINSON, J., and the late Justice T. M. KAVANAGH did not participate in the decision of this case.