**LONG v. COMMONWEALTH.**

Court of Appeals of Kentucky.

Dec. 11, 1953.

W. M. Melton, Hazard, for appellant.

J. D. Buckman, Atty. Gen., Zeb A. Stewart, Asst. Atty. Gen., for appellee.

STEWART, Justice.

Edward Long was tried and convicted in the Perry Circuit Court of voluntary manslaughter for the killing of Vertin Collins and sentenced to the penitentiary for 21 years. He appeals, urging the following grounds for reversal: (1) The verdict is not sustained by the evidence, and (2) the instructions are erroneous.

It appears from the evidence that deceased, Collins, Ben Perdue and appellant, Long, all lived in the mining camp of Blue Diamond Coal Company in Perry County. These three men were together at the home of Perdue during the night of December 20, 1952, and until approximately 8:00 o'clock the following morning. During this time, they consumed a considerable portion of a half-gallon of moonshine whiskey and at the time of the slaying of Collins all three of them were in an advanced state of intoxication. Long had brought along his shotgun and some shells for the purpose, he claimed, of going hunting the next day with some friends. At about 8:00 a. m., on the day of the homicide, Long discharged his shotgun at close range in the bedroom where the trio had gathered and Collins received the full blast in his chest, the charge making a hole about one inch in diameter where it entered his body. He began to bleed profusely, staggered through an adjoining room into the kitchen, fell to the floor and died shortly thereafter.

Darnell Perdue, the eleven-year-old son of Ben Perdue and a witness for the Commonwealth, testified he was in the room

just prior to the shooting and, according to him, his father and Collins were seated on the opposite side of the bed from the accused. He said he saw Collins flourish an old pistol and threaten to shoot his father "in the eye and nose" and, meanwhile, Long was standing apart from them and holding his shotgun between his legs. When Collins made the statement just mentioned the boy started to flee through the door. Just as he entered the doorway he heard a shot, and turning he "saw Mr. Ed. Long holding his gun and it was smoking."

Logan Duff, a private policeman for the Blue Diamond Coal Company, testified that, receiving a report a man had been shot at the Perdue home, he was on his way to this home to investigate when he encountered Perdue. The latter was drunk and he was covered with blood. Duff proceeded on to the house, went inside and entered the room where the shooting had occurred. There he found the bed in disarray and a rocking chair knocked over. He also stated there was a great deal of blood splashed about the room and a trail of blood led into the kitchen where he found the body of the deceased.

Mrs. Mariah Frazier, a witness for the Commonwealth who lived near by Perdue, testified that the accused came to her home on the morning of the killing and said he "had to go." The witness asked him, "Go where?" and the accused replied, "I killed Bert a few minutes ago." She explained that "Bert" was the nickname of Vertin Collins. Before departing he left the shotgun at Mrs. Frazier's house, and this weapon was later identified as the one used to kill Collins. Fred Eversole, a licensed embalmer, prepared the body of Collins for burial. Upon probing the wound in the chest of the deceased, he determined, though not conclusively, that the hole ranged downward.

Long took the stand on his own behalf and corroborated substantially all the facts we have set out up to the actual moment of the shooting. While admitting that on the morning of the homicide he, Perdue and Collins were extremely intoxicated, he denied there was any fight. He did say, however, that the latter two were "just playing" when Collins threatened to shoot his host in the eye and nose. Just before the shot was fired, Long testified he had decided to leave, and he reached for his gun, which until that time had been under the bed. In the meantime the deceased and Perdue were scuffling across the room. Appellant explained that as he pulled the gun from beneath the bed, with its barrel pointing slightly upward, it somehow struck the bed and went off, the discharge striking Collins in the manner heretofore described. Appellant steadfastly denied that he took the shotgun, aimed it, and shot the deceased. He maintained he never kept shells in the gun and had no knowledge that it was loaded on this occasion. Appellant said there had been no trouble between him and Collins or between him and Perdue. He also testified he had not seen Collins with a pistol. For some reason not disclosed by the record, Perdue was not introduced as a witness for either side.

■ Appellant insists he was entitled to a directed verdict of acquittal for the reason, first, that the evidence considered as a whole would compel one to speculate that a crime had been committed. He makes much of the fact that the Commonwealth failed to produce a single witness who actually saw the shot fired. It will be remembered from his testimony that he admitted the act of homicide but claims it was entirely an accident. This case therefore seems to fall within the rule that where the accused admits the killing the burden is upon him to show to the satisfaction of the jury that he is blameless.

■ We think the story related by Long as to how Collins met his death is so inherently improbable as to be unbelievable. Small wonder that the jury was unable to reconcile it with the evidence of others who testified. The Perdue boy, for instance, gave a more reasonable explanation of the tragic incident. He stated that just before the shot was fired Long had the shotgun in his hands holding it down between his legs. The boy was then asked what he

observed when he heard the report a few seconds later and he answered: "I saw Mr. Ed Long holding his gun and it was smoking." In addition, Long's statement that the shot ranged upward is refuted by the coroner who testified the probing of the wound indicated the course of the discharge was downward. Why was the accused fleeing from the scene of the crime, as testified to by Mrs. Frazier? Certainly such action is not consistent with his alleged innocence. Finally, the room where the slaying occurred indicated there had been violence upon the part of the recent occupants as shown by the torn-up bed and the knocked-down furniture. We conclude that the issue was clear cut as to whether the discharge from the shotgun was intentional or unintentional and the credibility of the evidence was for the jury to decide.

 The next allegation of error is without merit. Appellant contends the court should have confined its instructions to murder and self-defense and that an instruction on voluntary manslaughter was unauthorized and tended to confuse the jury to his prejudice. This Court has long adhered to the rule that where the circumstances indicate a possible lack of malice aforethought, coupled with the grossly careless or reckless use of a firearm, an instruction on voluntary manslaughter is proper. See Amburgey v. Commonwealth, 287 Ky. 421, 153 S.W.2d 918; Ewing v. Commonwealth, 129 Ky. 237, 111 S.W. 352. Appellant's argument, reinforced by his testimony, is to the effect that the act was not wilful, and there is evidence to indicate he was grossly careless and reckless in handling the shotgun before it went off. The jury also doubtless considered the testimony as to the drunken condition of Long as well as that of Perdue and Collins. In this connection we quote this language from Gregory's Criminal Law, Sec. 94, p. 107: "While as has been seen drunkenness is not an excuse for crime, the condition of drunkenness may not only be considered in determining the degree of the crime, but also in determining whether or not the alleged criminal act was accidental and excusable."

Who is to say whether in the absence of a voluntary manslaughter instruction the jury might not have convicted appellant of murder and given him death or life in the penitentiary? Unquestionably a voluntary manslaughter instruction was not only proper under the evidence but we fail to understand how appellant could have been prejudiced by it.

Wherefore, the judgment was affirmed.