PEOPLE v GARCIA

Docket No. 55926. Argued November 5, 1975 (Calendar No. 5).—
    Decided December 7, 1976. Rehearing denied 399 Mich 1041.

Henry Garcia was convicted in Lenawee Circuit Court, Rex B.
    Martin, J., of the first-degree murder of his wife and a compan-
    ion. The Court of Appeals, Danhof, P. J., and Fitzgerald and
    Quinn, JJ., affirmed (Docket No. 9928). After denial of a motion
    for new trial, the Court of Appeals, Danhof, P. J., and Bronson
    and O'Hara, JJ., affirmed again (Docket No. 14586). Defendant
    appeals. *Held:*

1. An appellate court tests the correctness of a denial of a
    motion for directed verdict of acquittal at the close of the
    prosecution's case by taking the evidence presented by the
    prosecution in the light most favorable to the prosecution and
    deciding if there is any evidence upon which the trier of fact
    could predicate a finding of guilty of the crime charged. To the
    extent that *People v Qualls,* 9 Mich App 689; 158 NW2d 60
    (1968), holds to the contrary, it is expressly overruled.

2. The circumstantial proofs presented contained evidence of
    the crime charged, and that the defendant committed it, suffi-
    cient to allow the trial court to deny a motion for a directed
    verdict of acquittal.

3. First-degree murder, other than felony murder, is a spe-
    cific-intent crime requiring an intention to take life. Voluntary
    intoxication can be a defense to a charge of a crime which
    requires specific intent, but the trial court could properly reject

REFERENCES FOR POINTS IN HEADNOTES
[1, 2] 75 Am Jur 2d, Trial §§ 550–553.
[2] 40 Am Jur 2d, Homicide §§ 315, 316.
[3, 12, 14] 40 Am Jur 2d, Homicide § 45.
[4, 5, 11–13, 15, 16, 18] 21 Am Jur 2d, Criminal Law § 107.
    40 Am Jur 2d, Homicide § 128.
[6, 8–10] 21 Am Jur 2d, Criminal Law § 315.
[7] No reference.
[13, 18] 76 Am Jur 2d, Trial § 1250 *et seq.*
[17, 19] 40 Am Jur 2d, Homicide §§ 44, 53.

the intoxication defense and find that the defendant had the ability to and did actually premeditate and deliberate over his wife's death.

4. The defendant was not deprived of a fair trial by the trial judge reading the transcript of the preliminary examination. The trial court did not err in relying on the long standing practice of a trial judge, reviewing the preliminary examination transcript when sitting as a trier of fact, especially in light of defense counsel's consent to it and one year prior to the announcement of the rule that the practice is reversible error.

5. The decision not to object to the trial court's reading of the entire preliminary examination transcript was a conscious choice of trial strategy which was taken for reasons that would appear sound to a competent criminal attorney. Even if this decision was a serious mistake of counsel, it did not deprive the defendant of a fair trial unless, but for the mistake, the defendant would have had a reasonably likely chance of acquittal.

6. The "sham" test of effective assistance of counsel i.e. that defendant was not deprived of the effective assistance of counsel unless his purported representation by counsel was a sham, is rejected. The test is that defense counsel must perform at least as well as a lawyer with ordinary training and skill in the criminal law and must conscientiously protect his client's interests, undeflected by conflicting considerations. Under this test, the assistance of counsel has not been constitutionally defective if action that appears erroneous from hindsight was taken for reasons that would appear sound to a competent criminal attorney.

Justice Levin, with whom Chief Justice Kavanagh concurred, would reverse and remand for entry of a judgment convicting the defendant of second-degree murder. Wilful, deliberate and premeditated (first-degree) murder is a crime of specific intent which cannot have been committed where the specific intent did not exist because of intoxication. The findings of the trial court that the defendant's ability to form a proper judgment was impaired by intoxication, and that he would not have killed the victims if he had been sober, are inconsistent with a finding that the killing was deliberate. The defendant was reckless in drinking, which released his suppressed hatred of his wife and caused him to follow his plan to kill her. Reckless killing is common-law or second-degree murder, and the finding that the defendant was guilty of first-degree murder necessarily

includes the finding that he was guilty of second-degree murder.

33 Mich App 598; 190 NW2d 347 (1971) affirmed.

51 Mich App 109; 214 NW2d 544 (1974) affirmed.

9 Mich App 689; 158 NW2d 60 (1968) overruled in part.

### OPINION OF THE COURT

1. CRIMINAL LAW—TRIAL—DIRECTED VERDICT OF ACQUITTAL.

   An appellate court tests the correctness of the denial of a motion for a directed verdict of acquittal by taking the evidence presented by the prosecution in the light most favorable to the prosecution and deciding if there was any evidence upon which the trier of fact could predicate a finding of guilty.

2. HOMICIDE—FIRST-DEGREE MURDER—DIRECTED VERDICT OF ACQUITTAL—EVIDENCE—SUFFICIENCY.

   Sufficient circumstantial evidence was presented to deny a motion for a directed verdict of acquittal in a trial for first-degree murder where the proofs established that the defendant had made recent threats to kill his wife and anyone found with her; witnesses to the killing of the defendant's wife and her male companion were unable to identify the defendant as the assailant, but testified that the assailant escaped in the defendant's car; the defendant was apprehended in the car and admitted being in sole possession of it during the time of the killings; the defendant possessed a revolver and ammunition of the type which killed his wife; and the defendant was observed driving after the killings at times and locations which were consistent with the assailant's departure from the scene of the crime.

3. HOMICIDE—FIRST-DEGREE MURDER—ELEMENTS OF CRIME—SPECIFIC INTENT.

   First-degree murder, other than felony murder, is a crime of specific intent requiring an intention to take life.

4. HOMICIDE—FIRST-DEGREE MURDER—DEFENSES—INTOXICATION—SPECIFIC INTENT.

   Voluntary intoxication can be a defense to a charge of first-degree murder (other than felony murder), which requires a specific intent; the crime cannot have been committed when the intent to kill did not exist.

5. HOMICIDE—FIRST-DEGREE MURDER—DEFENSES—INTOXICATION.

   A defendant's voluntary intoxication to whatever extent is not a defense to a charge of first-degree murder where before he becomes intoxicated the defendant either premeditates or delib-

erates or forms the specific intent necessary for the commission of first-degree murder while in possession of his mental faculties.

6. CRIMINAL LAW—EFFECTIVE ASSISTANCE OF COUNSEL—FAILURE TO OBJECT.

A decision of defense counsel not to object to a reading of the preliminary examination transcript by the trial judge did not deprive the defendant of a fair trial or effective assistance of counsel where the judge read the transcript in an attempt to evaluate testimony of an expert witness for the defense; the judge concluded that the testimony at trial was more favorable to the defense; defense counsel discussed with the court on the record the reasons for reading the transcript; and the court failed to anticipate a subsequent Supreme Court decision that the reading would be reversible error.

7. CRIMINAL LAW—EVIDENCE—PRELIMINARY EXAMINATION—TRANSCRIPT—RULE OF LAW—PROSPECTIVE APPLICATION.

The rule of law that it is reversible error for a trial court sitting without a jury to refer to a transcript of a preliminary examination, except under the exceptions provided by statute, is not to be accorded retroactive effect (MCL 768.26; MSA 28.1049).

8. CRIMINAL LAW—ASSISTANCE OF COUNSEL—EFFECTIVE ASSISTANCE—STANDARD.

The standard to determine whether a defendant had effective assistance of counsel in a criminal trial is that defense counsel must perform at least as well as a lawyer with ordinary training and skill in the criminal law and must conscientiously protect his client's interests, undeflected by conflicting considerations.

9. CRIMINAL LAW—ASSISTANCE OF COUNSEL—EFFECTIVE ASSISTANCE—STANDARD—"SHAM" TEST.

The "sham" test of effective assistance of counsel, *i.e.* that a defendant was not deprived of the effective assistance of counsel unless his purported representation by counsel was a sham, is rejected.

10. CRIMINAL LAW—ASSISTANCE OF COUNSEL—EFFECTIVE ASSISTANCE —MISTAKE OF COUNSEL.

The assistance of counsel in a criminal trial has not been constitutionally defective if action of counsel that appears erroneous from hindsight was taken for reasons that would appear sound to a competent criminal attorney.

DISSENTING OPINION

KAVANAGH, C. J., and LEVIN, J.

11. CRIMINAL LAW—DEFENSES—INTOXICATION—SPECIFIC INTENT.

*Intoxication is not a defense to a charge of a crime of general intent, but when a specific intent is a necessary element of a crime, the crime cannot have been committed where the specific intent did not exist because of intoxication.*

12. HOMICIDE—FIRST-DEGREE MURDER—DEFENSES—INTOXICATION—SPECIFIC INTENT.

*Wilful, deliberate and premeditated murder is a crime of specific intent, and voluntary intoxication may negate the requisite intent for that crime (MCL 750.316; MSA 28.548).*

13. APPEAL AND ERROR—BENCH TRIAL—FINDINGS OF FACT.

*An appellate court is obliged under court rule, in criminal as in civil cases, to set aside clearly erroneous findings of a judge sitting in a bench trial even if there is sufficient evidence to sustain the verdict of a jury reaching the same conclusion (GCR 1963, 517.1).*

14. HOMICIDE—FIRST DEGREE MURDER—ELEMENTS.

*First-degree murder is a statutory offense which consists of the common-law offense of murder, a homicide committed with malice aforethought, with an added element: murder by poison, by lying in wait, or by any other kind of wilful, deliberate, and premeditated killing, or in the perpetration of or attempt to perpetrate certain crimes enumerated by statute (MCL 750.316; MSA 28.548).*

15. HOMICIDE—FIRST-DEGREE MURDER—DEFENSES—INTOXICATION—SPECIFIC INTENT—DELIBERATION.

*Findings by a trial court that a defendant in a trial for first-degree murder impaired his ability to form a proper judgment by voluntary intoxication and that the defendant, if he had been sober, would not have killed the victim are inconsistent with a finding that the killing was deliberate (MCL 750.316; MSA 28.548).*

16. HOMICIDE—FIRST-DEGREE MURDER—DEFENSES—INTOXICATION—SPECIFIC INTENT—DELIBERATION.

*The term "deliberate" in the statute defining first-degree murder contemplates that the actor may reconsider a premeditated plan to kill; a person who at the time of a killing is so intoxicated that he kills although he would not kill if sober is not in a deliberative state of mind (MCL 750.316; MSA 28.548).*

17. HOMICIDE—MURDER—RECKLESS KILLING.

*Reckless killing is common-law, or second-degree, murder (MCL 750.317; MSA 28.549).*

18. APPEAL AND ERROR—FINDINGS OF FACT—CONCLUSIONS OF LAW.

*Findings of fact control inconsistent conclusions of law; a judgment cannot stand when it is based upon findings of fact of record which are antagonistic, inconsistent, or contradictory, or upon conclusions of law which are at variance with the findings of fact.*

19. HOMICIDE—FIRST-DEGREE MURDER—DEFENSES—INTOXICATION—INCLUDED OFFENSES.

*A defendant convicted of first-degree murder necessarily was found guilty of second-degree murder where the court found that the defendant formed the intent to kill the victim if the occasion arose, that the defendant knew he had a suppressed hatred for the victim, that he recklessly became intoxicated which released his suppressed hatred, and that if he had been sober he would not have killed the victim (MCL 750.316; MSA 28.548).*

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *Harvey A. Koselka,* Prosecuting Attorney, and *Dennis M. Powers* and *Lee W. Atkinson,* Assistants Attorney General, for the people.

*State Appellate Defender Office* (by *Norris J. Thomas, Jr.)* for defendant.

LINDEMER, J. In the early morning hours of December 15, 1969, Mrs. Eileen Garcia and Mr. Blevins Rinehart were shot to death outside the Peerless Gear Company in Clinton, Michigan. The slayings took place in the factory parking lot as the employees reported for the day shift. Both victims died of gunshot wounds to the head. Later that same day defendant was apprehended by the police and charged with the murder of his wife. In May of 1970, defendant was bench-tried before Lenawee County Circuit Judge Rex B. Martin.

Defendant was convicted of first-degree murder. MCLA 750.316; MSA 28.548. In his appeal of right, the Court of Appeals affirmed his conviction. 33 Mich App 598; 190 NW2d 347 (1971). Leave to appeal that decision to this Court was denied. 386 Mich 766 (1971). Defendant then filed a motion for a new trial with the trial court. Defendant appealed the denial of that motion to the Court of Appeals which again upheld the conviction. 51 Mich App 109; 214 NW2d 544 (1974). This Court granted defendant's application for leave to appeal. 392 Mich 803 (1974). We affirm.

Initially, we consider defendant's claim that the trial court improperly refused to direct a verdict of acquittal at the close of the prosecution's proofs. An appellate court tests the correctness of the denial of such motion by taking the evidence *presented by the prosecution* in the light most favorable to the prosecution and deciding if there was any evidence upon which the trier of fact could predicate a finding of guilty of murder in the first degree. *People v Vail,* 393 Mich 460; 227 NW2d 535 (1975). *People v Abernathy,* 253 Mich 583; 235 NW 261 (1931). To the extent that the case of *People v Qualls,* 9 Mich App 689; 158 NW2d 60 (1968), holds to the contrary, it is expressly overruled.

When moving for acquittal, defense counsel argued that there was no evidence linking defendant to the perpetration of the crime. We disagree. A number of persons who witnessed the slayings testified but were unable to positively identify defendant as the assailant. However, it was established that defendant had made several recent threats to kill his wife and anyone found with her; the assailant escaped in the defendant's car; and a police officer testified that when apprehended the

defendant admitted being in sole possession of his car during the time of the slayings. Defendant was known to have been in possession of a .22-caliber revolver and some ammunition. A police expert testified that the bullet recovered from the wife's body is of the type which could have been fired from such a pistol. The murder weapon was never recovered so a match between the bullet and the pistol could not be accomplished.

Witnesses testified that the slayings took place between 6:30 and 6:45 a.m. One witness observed that the assailant was wearing a dark topcoat. After the shooting, the assailant entered defendant's car and calmly drove from the parking lot (in Clinton) towards Tecumseh, approximately four miles south. Defendant was observed driving his car in Adrian, 15 miles south of Clinton, sometime between 7:00 and 7:30 a.m. Defendant, wearing a dark trench coat, arrived at James McClarren's house, about ten miles from the prior sighting, sometime between 7 and 8 a.m. We believe this chain of circumstantial evidence was sufficient to allow the trial judge to deny the motion. In our opinion these proofs contained some relevant evidence on each of the elements of the crime charged and that defendant was the perpetrator of that crime. The trial judge properly denied the motion for a directed verdict of acquittal at the close of the prosecution's case.

The next of defendant's four raised issues concerns the defense of voluntary intoxication. Defendant argues that the crime of first-degree murder requires the specific intent to kill. Defendant then argues that the law of this state is such that voluntary intoxication can be a defense to crimes which require a specific intent. Defendant concludes by arguing that the trial judge erroneously

concluded that defendant was not so intoxicated that he did not form the specific intent to kill. In related subarguments, the defendant alleges that the trial court failed to find all of the necessary elements of first-degree murder; that the defendant was acting under diminished mental responsibility sufficient to negate the elements of specific intent and premeditation and deliberation; and that the evidence was insufficient for a finding of guilt of any crime greater than the crime of voluntary manslaughter. MCLA 750.321; MSA 28.553. We find these related issues to be without merit.

Murder is homicide committed with malice aforethought. At the common law, the crime of murder was not divided into degrees. The present statutory scheme providing for the separation of murder into degrees was "for the purpose of graduating the punishment". *People v Doe,* 1 Mich 451, 457 (1850). This classification of murder by degree was first enacted by the State of Pennsylvania in 1794. In 1838, motivated by a concern that the more culpable forms of murder should be punished more severely, this state adopted a similar statutory scheme. *People v Potter,* 5 Mich 1, 6 (1858); *People v Morrin,* 31 Mich App 301, 325; 187 NW2d 434 (1971).

Courts in Pennsylvania have consistently held that their first-degree murder statute requires a specific intent to kill. *Commonwealth v Murray,* 2 Ashm (Pa) 41 (Phila O & T, 1834); *Commonwealth v Fostar,* 455 Pa 216; 317 A2d 188 (1974).

Michigan courts have not been so consistent. In *People v Scott,* 6 Mich 287, 294 (1859), this Court stated:

"Except in cases expressly named in the statute, *murder in the first degree requires the existence of a deliberate intention to take life;* and any slaying in

which a jury should find either the absence of delibera-
tion, or that the intent was to commit another and a
lesser injury, must be either murder in the second
degree or one of the lighter grades of homicide." (Em-
phasis supplied.)

However, confusion began when this Court, on
policy grounds, rejected the defense of voluntary
intoxication in a prosecution of first-degree mur-
der. *People v Garbutt,* 17 Mich 9 (1868). Broad
statements from cases involving second-degree
murder convictions added to the confusion. *Wellar
v People,* 30 Mich 16 (1874).

Another problem with some of the cases is that
the crime charged was not a homicide. An exam-
ple is *Roberts v People,* 19 Mich 401 (1870), which
involved an assault with intent to commit murder.
In hopes of ending the confusion and on the au-
thority in *Potter* and *Scott,* we hold that nonfelony
first-degree murder is a specific intent crime re-
quiring an intention to take life.

Our holding is supported by the language of the
first-degree murder statute.

"All murder which shall be perpetrated by means of
poison, or lying in wait, or any other kind of wilful,
deliberate and premeditated killing * * * shall be mur-
der of the first degree". MCLA 750.316; MSA 28.548.

A reading of the statute mandates the construc-
tion that "wilful * * * killing" means the intent to
accomplish the result of death.

Voluntary intoxication can be a defense to
crimes which require a specific intent.

"While it is true that drunkenness cannot excuse
crime, it is equally true that when a certain intent is a
necessary element in a crime, the crime cannot have

been committed when the intent did not exist." *People v Walker,* 38 Mich 156, 158 (1878).

In the case at bar, however, the trial judge rejected the defense of voluntary intoxication. We believe he did so properly. In his finding of facts, the trial judge stated:

"I think he formed an intent to do away with her [his wife] if he caught her with someone else. I think he went to Clinton early Monday morning with his pistol to kill her if the occasion arose and he thought he should."

These findings of fact support the conclusion that the murder was premeditated and deliberated upon. The record also supports the trial judge's conclusion the defendant acted with wilfulness. The trial judge found the killing to be intentional rather than accidental:

"The physical facts themselves, the place where the bullet went in each person, the fact there were no powder burns, the path of the bullet, the type of gun, the fact that it had to be cocked every time it was fired would completely belie this story, so there wasn't any accidental killing."

Defendant argues that certain remarks of the trial judge indicate that defendant was found to have been operating under a diminished mental capacity due to consumption of alcohol and lack of sleep. Specifically defendant points to these statements:

"I am convinced his ability to form a proper judgment was impaired by his voluntary consumption of intoxicants. * * * I am convinced he wouldn't have killed them, either one of them, if he had been sober."

However, the entire passage from which those comments were excised evidences an entirely different conclusion. Our review of the transcript leads us to believe that the trial judge was properly convinced that, in spite of his drinking spree, the defendant had the ability to and did actually premeditate and deliberate over his wife's death.

"Now, the people must convince the court beyond a reasonable doubt of premeditation and malice to have first-degree murder. Dr. DuKay stated very emphatically among some of his other testimony that when you take the total picture of the alcoholism, the lack of sleep, the lack of food, etc., the defendant didn't have the ability to specifically form an intent to murder, and he was pretty definite about this. He also said another thing, and frankly, I looked at my notes, and I wasn't too sure that probably I got it down right, so I asked the reporter to type out this particular question and answer just to make sure I had heard Dr. DuKay correctly, and on cross-examination, Mr. Koselka asked him, 'Again, I want to be sure I understand this, doctor. You are saying then, doctor, that he did in your opinion have the intent to murder, but his ability to form this intent was impaired by the use of alcohol?' And the answer was, 'I think that that's what it really can be summarized.' So Dr. DuKay, in effect, has said he could have this intent and did have it and yet on another occasion he said he didn't think he had the intent. Now, I think Dr. DuKay also said again it wasn't his responsibility to make that determination, and, of course, he was correct in this. I am convinced that the defendant had the ability to form a proper judgment—pardon me. I am convinced his ability to form a proper judgment was impaired by his voluntary consumption of intoxicants. I believe his inhibitions were released by intoxicants. His basic subconscious hatred of his wife, because of her failure to be the mother, the housekeeper, and the wife he had wanted her to be, came to the forefront. Now, he knew that this dislike of his wife came to the forefront when he drank. He'd been told this. He testified himself that he knew about this. I think he formed

an intent to do away with her if he caught her with
somebody else. I think he went to Clinton early Monday
morning with his pistol to kill her if the occasion arose
and he thought he should. I don't think he went there
to give her the pistol at all. This doesn't make sense.
He found her with Mr. Blevins [Rinehart]. It was an
innocent meeting between the two of them. I think she
went to Mr. Blevins to see if he had brought her work
clothes so she could go into work. He killed them both.
I am convinced he wouldn't have killed them, either
one of them, if he'd been sober. I don't think there's
any question in my mind about that. I am convinced he
was not so drunk as to have lost the ability to have
malice, that malice arose in his heart and his mind. In
fact, I think the drinking released the controls on the
suppressed malice. That the court is convinced that he
was not so drunk as to be unable to plan ahead to do
what he did. I am satisfied beyond a reasonable doubt
that all the elements of first-degree murder have been
proved. The court would find him guilty of that of-
fense."

The nature of defendant's impairment was de-
scribed as (1) his inhibitions were released, (2) his
subconscious hatred of his wife came to the fore-
front, and (3) drinking released his controls on
suppressed malice. Judged in light of his other
comments about defendant's ability to form a
proper judgment and entertain malice, we believe
the trial judge must have concluded these "impair-
ments" were of a minimal nature. Such a conclu-
sion is supported by the trial judge's finding that
defendant had exaggerated his testimony concern-
ing consumption of intoxicants and lack of sleep.
We find nothing in this record to indicate that
defendant's consumption of intoxicants so clouded
his ability to reason that he was unable to premed-
itate or deliberate over his actions at the time of
the slayings.

In a bench trial, it is the role of the trial judge

sitting as the trier of fact to observe the witnesses and decide the weight and credibility to be given to their testimony. Where sufficient evidence exists to sustain a verdict of guilty beyond a reasonable doubt, the decision of the judge should not be disturbed by an appellate court. The task of the reviewing court must be to examine the record to determine whether the evidence was ample to warrant a verdict of guilty beyond a reasonable doubt of the crime charged. Our review of this record leads us to conclude that there was sufficient evidence on each and every element of the crime of first-degree murder to sustain the decision of the trial judge.

Next the defendant alleges that reversible error was committed when the trial judge, sitting as a trier of fact, read the entire transcript of the preliminary examination. To support his contention defendant cites the case of *People v Ramsey,* 385 Mich 221; 187 NW2d 887 (1971). In *Ramsey,* this Court considered MCLA 768.26; MSA 28.1049, and held that:

"[A]s an absolute rule it is reversible error for the trial court sitting without a jury to refer to the transcript of testimony taken at the preliminary examination except under the exceptions provided by [the above] statute." *Ramsey, supra* at 225.

The policy behind *Ramsey* was to "assure that an accused has a right to confront all of the witnesses against him in open court, and to have all of the evidence against him placed in the record at the trial". *Ramsey, supra* at 224–225. However, we find defendant's reliance upon *Ramsey* misplaced.

The rule fashioned by this Court in *Ramsey* was not announced until one year after the trial of this case had concluded. Prior to *Ramsey,* review of the

preliminary examination transcript was a gener-
ally accepted practice for the trial judge sitting as
a trier of fact. We cannot fault the trial judge's
reliance on this long standing practice especially
in light of defense counsel's consent to it. Upon
consideration of the standards enunciated in *Link-
letter v Walker,* 381 US 618; 85 S Ct 1731; 14 L Ed
2d 601 (1965), and *People v Hampton,* 384 Mich
669; 187 NW2d 404 (1971), we hold the rule an-
nounced in *Ramsey* is not to be accorded retroac-
tive effect.

Finally defendant contends that he was denied a
fair trial by the defense counsel's failure to object
to the trial court's reading of the entire prelimi-
nary examination transcript. Defendant argues
that this constituted the serious mistake and but
for this mistake there was a great likelihood that
he would not have been convicted. This is the two-
prong test set forth in *People v Degraffenreid,* 19
Mich App 702; 173 NW2d 317 (1969). Defendant
also contends that he is entitled to a new trial
under the doctrine established in *Beasley v United
States,* 491 F2d 687, 696 (CA 6, 1974). *Beasley* held
that:

"Defense counsel must perform at least as well as a
lawyer with ordinary training and skill in the criminal
law and must conscientiously protect his client's inter-
ests, undeflected by conflicting considerations."

We do not believe the alleged error amounts to
reversible error under either *Beasley* or *Degraffen-
reid.* In his findings of fact, the trial judge re-
marked:

"I think we had a well tried lawsuit here. The wit-
nesses were brought in and examined and cross-exam-
ined well, and it was well argued. * * * I wondered at

first why defense counsel and his client had waived a jury in this case, and as I got to thinking about it, I could probably understand best after we heard Dr. DuKay's testimony, because this particular type of defense has been offered many times in this court, and frankly, I don't think that we've ever had an occasion where a jury has accepted it as a defense. I don't think that we have ever had the case as a defense as well presented as we had it by Dr. DuKay."

The trial judge read the preliminary transcript to help him to evaluate the testimony of Dr. DuKay. Considering the importance of Dr. DuKay's testimony in this trial, it is likely that defense counsel perceived the trial judge's reading of the preliminary examination transcript would be beneficial to the defense. Apparently the trial judge thought otherwise:

"Now, I went through the preliminary examination yesterday, and frankly, I don't think the preliminary examination set forth the defendant's case as strongly as the trial itself did. I think the testimony brought out at trial was much stronger * * * ."

*People v Degraffenreid, supra,* adopts a strict standard for the review of claims of effective assistance of counsel.

"The constitutional right to counsel does not guarantee an accused person that his lawyer will not make a big mistake. The Constitution guarantees only that the accused person will enjoy representation by an attorney adequately equipped by his training in the law to undertake the case and who will diligently, conscientiously and honestly represent the accused person." *Degraffenreid, supra* at 712 (footnotes deleted).

*Degraffenreid* goes on to state that:

"A claim that an adequate lawyer made a serious mistake does not raise the constitutional issue of right to counsel; it does not involve the concept of 'effective assistance of counsel', it should not be measured against the sham trial standard which circumscribes the constitutional right." *Degraffenreid, supra* at 717.

However, even where assistance of counsel satisfies the constitutional requirements, defendant is still entitled to a fair trial. Defendant can be denied this right if his attorney makes a serious mistake. But a court should not grant a new trial unless it finds that but for this mistake defendant would have had a reasonably likely chance of acquittal. *Degraffenreid, supra* at 718.

In *Beasley, supra* at 696, the Sixth Circuit rejects the farce or mockery standard as a meaningful test of the Sixth Amendment right to effective assistance of counsel.

We agree with the Sixth Circuit that the time has come for this Court to reject the "sham test". However, in adopting *Beasley* and applying it to this case, we fail to find reversible error has been committed. We believe the decision of defense counsel not to object to the trial judge's reading of the preliminary examination transcript to be a conscious choice of trial strategy. Under *Beasley,* if such "action that appears erroneous from hindsight was taken for reasons that would appear sound to a competent criminal attorney, the assistance of counsel has not been constitutionally defective". The alleged mistake is of this caliber. We conclude that defendant was deprived of neither a fair trial or effective assistance of counsel.

The Court of Appeals is affirmed.

WILLIAMS and COLEMAN, JJ., concurred with LINDEMER, J.

FITZGERALD and RYAN, JJ., took no part in the decision of this case.

LEVIN, J. *(dissenting).* Henry Garcia shot and killed his wife, Eileen Garcia, and a man with her, Blevins Rinehart. The information charged first-degree murder of his wife. He was convicted of that offense by the judge following a bench trial.

The defense was that the shooting was accidental or that, by reason of intoxication, Garcia did not intend to kill and, if he did, the killing was not "wilful, deliberate and premeditated".[1]

Intoxication does not negative "general intent". It can be shown, however, to negative a requisite "specific intent". *People v Crittle,* 390 Mich 367, 372; 212 NW2d 196 (1973); *People v Kelley,* 21 Mich App 612, 618; 176 NW2d 435 (1970).

"While it is true that drunkenness cannot excuse crime, it is equally true that when a certain intent is a necessary element in a crime, the crime cannot have been committed when the intent did not exist." *People v Walker,* 38 Mich 156, 158 (1878).

We agree[2] that "wilful, deliberate and premedi-

---

[1] MCLA 750.316; MSA 28.548.

[2] My colleague writes that *"nonfelony* first-degree murder is a specific intent crime requiring an intention to take life". (Emphasis added.)

Felony first-degree murder is a "murder * * * committed in the perpetration, or attempt to perpetrate any arson, rape, robbery, burglary, larceny of any kind, extortion or kidnapping." MCLA 750.316; MSA 28.548.

Robbery *(see People v Kelley,* 21 Mich App 612, 619; 176 NW2d 435 [1970]), burglary *(see People v Eggleston,* 186 Mich 510; 152 NW 944 [1915]; *People v Depew,* 215 Mich 317; 183 NW 750 [1921]), and larceny *(see People v Walker,* 38 Mich 156, 158 [1878]) are specific intent crimes.

In *People v Guillett,* 342 Mich 1; 69 NW2d 140 (1955), the defendant's conviction of assault with intent to commit rape was reversed because the court instructed that voluntary intoxication was not a

tated" killing, first-degree murder, is a specific intent crime and that intoxication, albeit voluntary, may negative the requisite intent.[3]

defense. Some courts hold that rape is not a specific intent crime. *See* LaFave & Scott, Criminal Law, § 45, p 344, fn 18.

Commentators generally are critical of the general intent/specific intent distinction:

"It is sometimes stated that intoxication can negative a 'specific intent' which the crime in question may require (meaning some intent in addition to the intent to do the physical act which the crime requires), but it cannot negative a crime's 'general intent' (meaning an intent to do the physical act—or, perhaps, recklessly doing the physical act—which the crime requires). Some cases therefore have held that voluntary intoxication cannot be a defense to rape even though it blots out the intent to have intercourse, since that intent is a general intent and not a specific intent. But this is wrong on principle, for if intoxication does in fact negative an intention which is a required element of the crime (whether it be called specific intent or general intent), the crime has not been committed. Some cases have held that intoxication cannot be a defense to battery, a crime sometimes said to require only a general intent. This, however, is correct on principle, since battery can be committed not only with an intent to do the physical act of striking the other person (which intoxication can negative) but also, without any such intent to strike, by recklessly striking; and recklessness cannot, by the weight of authority, be negatived by intoxication.

"A few jurisdictions, going even further astray, have held that voluntary intoxication is no defense even when it negatives the 'specific intent' or knowledge which a crime may require. This view is clearly wrong.

"By way of conclusion, it may be said that it is better, when considering the effect of the defendant's voluntary intoxication upon his criminal liability, to stay away from those misleading concepts of general intent and specific intent. Instead one should ask, first, what intent (or knowledge) if any does the crime in question require; and then, if the crime requires some intent (knowledge), did the defendant in fact entertain such an intent (or, did he in fact know what the crime requires him to know)." LaFave & Scott, *supra*, § 45, pp 343–344.

*See also*, Hall, *Intoxication and Criminal Responsibility*, 57 Harv L Rev 1045, 1064 (1944).

*See, generally, Director of Public Prosecutions v Majewski*, [1976] AC __; 2 All ER 142 (All England Law Reports, Part 3, May 11, 1976).

[3] This rule is well established in the jurisprudence. *See* Hankins v *State*, 206 Ark 881; 178 SW2d 56 (1944); *People v Isby*, 30 Cal 2d 879; 186 P2d 405 (1947); *Smith v People*, 120 Colo 39, 206 P2d 826 (1949); *State v Dortch*, 139 Conn 317; 93 A2d 490 (1952); *State ex rel Goepel v Kelly*, 68 So 2d 351 (Fla, 1953); *State v Snowden*, 79 Idaho 266; 313 P2d 706 (1957); *People v Lion*, 10 Ill 2d 208; 139 NE2d 757 (1957); *State v Christie*, 243 Iowa 1199; 53 NW2d 887, 54 NW2d 927 (1952);

The Court affirms Garcia's conviction of first-degree murder on alternative grounds:

(a) "We find nothing in the record to indicate that defendant's consumption of intoxicants so clouded his ability to reason that he was unable[4] to premeditate or deliberate over his actions at the time of the slayings".

(b) Although the judge found that Garcia would not "have killed them, either one of them, if he had been sober", in finding him guilty of first-degree murder the judge necessarily concluded that the killing was deliberate and premeditated. "Judged in light of his other comments about defendant's ability to form a proper judgment and entertain malice, we believe the trial judge must have concluded these 'impairments' were of a minimal nature."

(c) There was sufficient evidence to sustain the decision of the trial judge. "Where sufficient evidence exists to sustain a verdict of guilty beyond a reasonable doubt, the decision of the judge should not be disturbed by an appellate court. The task of the reviewing court must be to examine the record to determine whether the evidence was ample to warrant a verdict of guilty beyond a reasonable doubt of the crime charged."

---

*Long v Commonwealth,* 262 SW2d 809 (Ky, 1953); *State v Youngblood,* 235 La 1087; 106 So 2d 689 (1958); *State v Palen,* 119 Mont 600; 178 P2d 862 (1947); *State v Bourdlais,* 70 Nev 233; 265 P2d 761 (1954); *State v King,* 37 NJ 285; 181 A2d 158 (1962); *People v Jackson,* 14 NY2d 5; 247 NYS2d 481; 196 NE2d 887 (1964); *State v Absher,* 226 NC 656; 40 SE2d 26 (1946); *State v Braley,* 224 Ore 1; 355 P2d 467 (1960); *Commonwealth v Chapman,* 359 Pa 164; 58 A2d 433 (1948); *State v Thompson,* 110 Utah 113; 170 P2d 153 (1946); *State v Hartley,* 25 Wash 2d 211; 170 P2d 333 (1946); *State v Bragg,* 140 W Va 585; 87 SE2d 689 (1955).

[4] Just as the question is not whether a defendant has the capacity to entertain the intent but whether he in fact entertained it, *People v Crittle,* 390 Mich 367; 212 NW2d 196 (1973), so too the question here is not whether Garcia's ability to reason was so clouded that he was unable to deliberate, but whether he did in fact deliberate.

There was, however, sufficient evidence of Garcia's insobriety to support a finding that by reason of intoxication he did not premeditate or deliberate at the time of the killings. The judge did not find that Garcia had the "ability to form a proper judgment". His finding of malice supports only a conviction of second-degree murder and does not reach the added elements of deliberation and premeditation necessary to escalate the offense to first-degree murder.

The Court seemingly applies to the judge's findings a reviewing standard akin to that applicable to a jury's verdict. On appeal from a conviction on a jury's verdict we consider whether there was sufficient evidence to support the verdict. On review of a judge's findings and conclusion, we are obliged, under the "clearly erroneous" standard, to reverse if we are left with the definite and firm conviction that a mistake was made.

We would reduce the degree of conviction from first- to second-degree murder because the judge's finding that Garcia would not have killed the victims if he had been sober, "I don't think there's any question about that", precludes a finding that this was a "deliberate" killing.

I

The evidence would support a finding that by reason of intoxication the killing was not deliberate.

The killing occurred on a Monday. Garcia and other witnesses testified that he began drinking on the preceding Friday afternoon and that he drank continually with little sleep during the intervening period.

The judge's findings implicitly recognize that

there was sufficient evidence on the question of intoxication to raise an issue for the trier of fact. "I believe the defendant drank a lot on Friday and Saturday and on Sunday, and I believe that the defendant slept, but very little on those nights." His further findings, "I believe he drank too much, but I don't believe he drank as much as he claimed. I believe he slept and ate too little, but I think he had more sleep and more to eat than he claims", go to the weight, not the sufficiency of the evidence to raise the issue of intoxication.

## II

An appellate court is obliged under GCR 1963, 517.1, in criminal[5] as in civil cases, to set aside clearly erroneous findings of a trial judge even if there is sufficient evidence to support them.

This Court recently considered the clearly erroneous standard and reversed because on our review of the record we were left with the definite and firm conviction that the judge had committed a mistake in his findings.

"We reverse the Court of Appeals and the trial court, remanding to the Court of Claims for a determination as to damages. Under GCR 1963, 517.1, an appellate

---

[5] GCR 1963, 517.1 in terms applies "[i]n all actions tried upon the facts without a jury".

GCR 1963, 785.1(1) provides that

"The provisions of the Rules of Civil Procedure shall apply to criminal cases, except as otherwise provided by rule or statute, and except when it clearly appears that they apply to civil actions only, or where statutes or special court rules provide a different procedure."

This Court has held that GCR 1963, 517.1 applies in criminal cases.

"[I]n criminal cases as well as civil cases a judge who sits without a jury is obliged to articulate the reasons for his decision in findings of fact. Findings of fact in a nonjury case serve a function paralleling the judge's charge in a jury case, that of revealing the law applied by the fact finder." *People v Jackson,* 390 Mich 621, 627; 212 NW2d 918 (1973).

court will set aside the findings of fact of a trial court sitting without a jury when such findings are clearly erroneous. In construing comparable 'clearly erroneous' language in Rule 52(a) of the Federal Rules of Civil Procedure, the United States Supreme Court has stated that '[a] finding is "clearly erroneous" when *although there is evidence to support it,* the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' After a review of the entire record of this case, we are left with such a definite and firm conviction. Appropriately, the 'judicial sieve' with which we have sifted the evidence in this non-jury case is 'of finer mesh than the one correspondingly employed on review' of a jury's verdict." *Tuttle v Department of State Highways,* 397 Mich 44, 46; 243 NW2d 244 (1976).[6] (Emphasis supplied.)

In a bench-tried case we review the evidence for

[6] The Court added the following in a footnote:

"*Schneider v Pomerville,* 348 Mich 49, 54–55; 81 NW2d 405 (1957): 'Our duty under said Rule 64, the question being duly posed and saved for review, is to sift the evidence for determination whether it clearly preponderates in favor of the appellant's cause. Necessarily, the judicial sieve will be of finer mesh than the one correspondingly employed here on review of denial of motion for new trial in a jury case. This is as it should be. A jury's verdict-view of facts is entitled to an even higher degree of appellate respect than is a judge's verdict-view of the same facts, learned though the judge may be in law. For reasons known well to students of American history, a finding of fact by "the twelvers" is more apt to be sound than that of one man. If this be right, our task at bar is bound to be a more difficult one than if the judgment below had been entered on verdict of a jury. When in rare instance a jury's verdict is judged contrary to overwhelming weight of evidence, the conclusion must be so obvious that verdict-sustaining argument loses all force. On the other hand, when evidence is appraised to determine clear preponderance thereof, forceful argument each way subsists to the last and usually survives final judgment.' (Footnotes omitted.) *See, also, Brady v Michigan Consolidated Co,* 31 Mich App 498, 499, fn 1; 188 NW2d 58 (1971).

"We emphasize that in this case there was little conflict between trial testimony and documents contemporaneous to the events surrounding the accident. Therefore, we do not ignore the command of GCR 1963, 517.1 to give special regard to the opportunity of the trial court to judge the credibility of witnesses who appeared before it. After thorough review of the admittedly cold record, this is a case where we can say without hesitation that mistake was committed below." *Tuttle v Department of State Highways,* 397 Mich 44, 46–47, fn 3; 243 NW2d 244 (1976).

more than mere sufficiency. While due deference is
to be given to the judge's determination of credibil-
ity issues (GCR 1963, 517.1), we are obliged to
reverse his findings of fact and conclusion, even if
there is sufficient evidence to sustain a jury verdict
reaching the same conclusion, if we are left with
the definite and firm conviction that a mistake has
been committed.

## III

### The judge found:[7]

[7] The judge's findings on the issue of intoxication were:

"Gregory Moore was a young boy. I thought he was fairly credible.
* * * Now, he testified that the defendant did drink quite a bit. He
did testify that he rode with the defendant on that night in question
and on Sunday morning when he went back to Metamora; that the
defendant drove and talked and acted normal both Saturday night
and Sunday morning, although he had been drinking.

\* \* \*

"As to Herbert Hasley, I thought he was fairly credible. I thought
he was wrong on the time that he said the defendant was at his
house. I thought he was correct in saying the defendant was there
and that he did drink at his house and that he did sleep at his house.

\* \* \*

"Now, I look at this, and then we check Dr. DuKay's testimony. I
am firmly convinced that Dr. DuKay was correct in saying that the
defendant is an alcoholic. I believe that defendant drank a lot on
Friday and Saturday and on Sunday, and I believe that the defendant
slept, but very little on those nights.

\* \* \*

"He loved, as an alcoholic, he loved his drinking and his existence
apart from his wife more than he loved his wife. * * * I believe he
drank too much, but I don't believe he drank as much as he claimed.
I believe he slept and ate too little, but I think he had more sleep and
more to eat than he claims. * * *

"Now, the people must convince the court beyond a reasonable
doubt of premeditation and malice to have first-degree murder. Dr.
DuKay stated very emphatically among some of his other testimony
that when you take the total picture of the alcoholism, the lack of
sleep, the lack of food, etc., the defendant didn't have the ability to
specifically form an intent to murder, and he was pretty definite
about this. He also said another thing, and frankly, I looked at my
notes, and I wasn't too sure that probably I got it down right, so I
asked the reporter to type out this particular question and answer

Garcia intended, while not so drunk as to be unable to plan ahead, to kill his wife if he found her with another man:

"I think he formed an intent to do away with her if he caught her with somebody else. * * * That the court is convinced that he was not so drunk as to be unable to plan ahead to do what he did."

Pursuant to that plan he went with a pistol to kill her if the occasion arose and he thought he should:

just to make sure I had heard Dr. DuKay correctly, and on cross-examination, Mr. Koselka asked him, 'Again, I want to be sure I understand this, doctor. You are saying then, doctor, that he did in your opinion have the intent to murder, but his ability to form this intent was impaired by the use of alcohol?' And the answer was, 'I think that that's what it really can be summarized.' So Dr. DuKay, in effect, has said he could have this intent and did have it and yet on another occasion he said he didn't think he had the intent. Now, I think Dr. DuKay also said again it wasn't his responsibility to make that determination, and, of course, he was correct in this. I am convinced that the defendant had the ability to form a proper judgment—pardon me. I am convinced his ability to form a proper judgment was impaired by his voluntary consumption of intoxicants. I believe his inhibitions were released by intoxicants. His basic subconscious hatred of his wife, because of her failure to be the mother, the housekeeper, and the wife he had wanted her to be, came to the forefront. Now, he knew that his dislike of his wife came to the forefront when he drank. He'd been told this. He testified himself that he knew about this. I think he formed an intent to do away with her if he caught her with somebody else. I think he went to Clinton early Monday morning with his pistol to kill her if the occasion arose and he thought he should. I don't think he went there to give her the pistol at all. This doesn't make sense. He found her with Mr. Blevins [Rinehart]. It was an innocent meeting between the two of them. I think she went to Mr. Blevins [Rinehart] to see if he had brought her work clothes so she could go into work. He killed them both. I am convinced he wouldn't have killed them, either one of them, if he'd been sober. I don't think there's any question about that. I am convinced he was not so drunk as to have lost the ability to have malice, that malice arose in his heart and his mind. In fact, I think the drinking released the controls on the suppressed malice. That the court is convinced that he was not so drunk as to be unable to plan ahead to do what he did. I am satisfied beyond a reasonable doubt that all the elements of first-degree murder have been proved. The court would find him guilty of that offense."

"I think he went to Clinton early Monday morning with his pistol to kill her if the occasion arose and he thought he should."

The occasion arose:

"He found her with Mr. Blevins [Rinehart]."

He killed his wife and the man he found her with:

"He killed them both."

First-degree murder "is the common-law offense of murder (homicide committed with 'malice aforethought') with an added element".[8] The added element here alleged is that the killing was "wilful, deliberate and premeditated".[9]

The judge found that when the killing occurred Garcia was not so drunk as to negative malice aforethought, intent to kill: "I am convinced he was not so drunk as to have lost the ability to have malice, that malice arose in his heart and his mind. In fact, I think the drinking released the controls on the suppressed malice." These findings go only to whether the defendant intended to kill (an element of second-degree murder) and not to whether the evidence established the added elements, premeditation and deliberation, constituting the offense of first-degree murder. "Malice aforethought is the intention to kill"; "afore-

---

[8] *People v Morrin,* 31 Mich App 301, 324; 187 NW2d 434 (1971).

[9] The added elements may be either that the murder

i) was perpetrated "by means of poison, or lying in wait"; or

ii) was "any other kind of wilful, deliberate and premeditated killing"; or

iii) was "committed in the perpetration, or attempt to perpetrate any arson, rape, robbery, burglary, larceny of any kind, extortion or kidnapping". MCLA 750.316; MSA 28.548.

thought", in the phrase malice aforethought, is
"meaningless surplusage" and does not encompass
premeditation or deliberation.[10]

The judge did not find that Garcia "had the
ability to form a proper judgment". The judge said,
"I am convinced that the defendant had the ability
to form a proper judgment—pardon me. I am

---

[10] "A person who kills another is guilty of the crime of murder if
the homicide is committed with malice aforethought. Malice afore-
thought is the intention to kill, actual or implied, under circum-
stances which do not constitute excuse or justification or mitigate the
degree of the offense to manslaughter. The intent to kill may be
implied where the actor actually intends to inflict great bodily harm
or the natural tendency of his behavior is to cause death or great
bodily harm. (The common-law felony-murder rule is an example of
implied intent or implied malice aforethought.)" *People v Morrin,
supra*, pp 310–311.

"The fact that malice aforethought means merely that malice must
exist at the same time as the act, in effect makes 'aforethought'
meaningless surplusage." 1 Wharton's Criminal Law and Procedure,
§ 243, p 527.

"[T]he word 'aforethought' is a word without any practical signifi-
cance in common law murder." Moreland, Law of Homicide, p 70.

"As a matter of law a killing may be with malice aforethought
although it is conceived and executed 'on the spur of the moment.'"
Perkins on Criminal Law (2d ed), ch 2, § 1, p 35.

*See also* LaFave & Scott, Criminal Law, p 529; *People v Morrin,
supra,* p 312, n 11 and accompanying text.

The majority view is that intoxication is not a defense to second-
degree murder—intoxication does not negative malice aforethought:

"It is generally, held, however, that intoxication cannot further
reduce the homicide from second degree murder down to manslaugh-
ter. Perhaps this is because the intent to kill or do serious bodily
injury which (without any accompanying premeditation and delibera-
tion) will do for second degree murder may be found in the defend-
ant's use of a deadly weapon upon his victim. Doubtless a better
explanation is that one may be guilty of second degree murder, in
most jurisdictions which divide murder into two degrees, by killing
without any intent to kill or injure but with a high degree of
recklessness (the 'depraved heart' type of murder), and, as we shall
see below, although intoxication can negative a required intention, it
cannot (by the majority view) negative recklessness. Nevertheless,
there is some authority for the proposition that intoxication which
blots out not only the premeditation and deliberation but also the
intent to kill or do serious injury will reduce a homicide down to
manslaughter." LaFave & Scott, *supra,* § 45, p 345.

Similarly, *see People v Kelley,* 21 Mich App 612, 620; 176 NW2d
435 (1970).

convinced his ability to form a proper judgment was impaired by his voluntary consumption of intoxicants."

A fair reading of the finding that Garcia "was not so drunk as to be unable to plan ahead to do what he did" is that when he conceived the plan to kill his wife "if the occasion arose and he thought he should" he was sober enough to so plan. The killing was in that sense premeditated.

While the judge concluded, "I am satisfied beyond a reasonable doubt that all the elements of first-degree murder have been proved," he made no specific finding on whether the killing was wilful or deliberate. His findings, "I am convinced his ability to form a proper judgment was impaired by his voluntary consumption of intoxicants. * * * I am convinced he wouldn't have killed them, either one of them, if he'd been sober. I don't think there's any question about that", preclude a finding that the killing was deliberate.

"Deliberation" contemplates that the actor may reconsider a premeditated plan to kill. A person who at the time of a killing is so intoxicated that he kills although, as the judge found, he would not kill if sober is not in a deliberative state of mind.

The term "wilful, deliberate and premeditated" distinguishes between cool-headed and hot-headed murder. "Perhaps the best that can be said of 'deliberation' is that it requires a cool mind that is capable of reflection." LaFave & Scott, Criminal Law, § 73, p 563. A person who is not in a reflective, deliberative state of mind when actually confronted with the life and death choice cannot deliberate in the sense contemplated by the statute:

"At the trial the vital question was the defendant's

state of mind at the moment of the homicide. Did he shoot with a deliberate and premeditated design to kill? Was he so inflamed by drink or by anger or by both combined that, though he knew the nature of his act, he was the prey to sudden impulse, the fury of the fleeting moment?" *People v Zackowitz*, 254 NY 192, 194–195; 172 NE 466 (1930).

The judge found that Garcia was aware that his "basic subconscious hatred", "this dislike of his wife came to the forefront when he drank" and that "drinking released the controls on the suppressed malice". It does not follow nor did the judge find that Garcia drank to build up courage to commit the crime.[11] The most that the record and the judge's findings would support is that, having formed the intent to kill his wife if the occasion arose and he thought he should and knowing that his suppressed hatred of her was released by intoxicating liquor, Garcia was reckless in drinking. Reckless killing is common-law or second-degree murder.[12] Convicting Garcia of first-degree murder because he acted recklessly in

[11] "One who, having already formed the intention to commit a crime, drinks in order to work up his nerve to commit the crime, cannot avail himself of the defense of intoxication even though, by the time he does commit the crime, he has become too intoxicated to entertain the intent which the crime requires." LaFave & Scott, *supra*, § 45, pp 344–345.

[12] "Malice is usually implied when homicide results if:

"(a) There is intent to inflict great bodily harm

"(b) An act is wilfully performed or omitted and the natural tendency of such behavior is to cause death or great bodily harm." Clark & Marshall, Law of Crimes (7th ed, 1967), § 10.04, p 631.

"[A]n act may involve such a wanton and wilful disregard of an unreasonable human risk as to constitute malice aforethought even if there is no actual intent to kill or injure." Perkins, Criminal Law (2d ed, 1969), ch 2, § 1(B), p 36.

"Extremely negligent conduct, which creates what a reasonable man would realize to be not only an unjustifiable but also a very high degree of risk of death or serious bodily injury to another or to others —though unaccompanied by any intent to kill or do serious bodily injury—and which actually causes the death of another, may constitute murder. There is a dispute as to whether, in addition to creating this great risk, the defendant himself must subjectively be aware of

drinking would erase the distinction between reckless (second-degree) murder and wilful, deliberate and premeditated (first-degree) murder.

The judge found that Garcia was an alcoholic. "I am firmly convinced that Dr. DuKay was correct in saying that the defendant is an alcoholic. * * * He loved, as an alcoholic, he loved his drinking * * * ." It was not unusual for Garcia to drink too much. The record would not support a conclusion that Garcia drank before the killing as part of a plan to work up his nerve to commit the crime.

The people had the burden of proof on the issue of whether the killing was deliberate and premeditated. The specific finding that Garcia would not have killed if sober precludes a conclusion that the killing was deliberate. "Findings of fact control inconsistent conclusions of law." *Kane v Klos,* 50 Wash 2d 778, 789; 314 P2d 672, 679 (1957).[13] The judgment of conviction of first-degree murder, based on a conclusion opposed by the specific finding, is without proper foundation. "A judgment cannot stand when it is based upon findings of fact of record which are antagonistic, inconsistent, or contradictory, or upon conclusions of law which are at variance with the findings of fact." *Wenzel v Wenzel,* 283 SW2d 882, 887 (Mo Ct App, 1955).

In finding Garcia guilty of first-degree murder,

---

the great risk which his conduct creates, in order to be guilty of murder." LaFave & Scott, *supra,* § 70, p 541.

"[R]ecklessness cannot, by the weight of authority, be negatived by intoxication." LaFave & Scott, *supra,* § 45, p 344.

*See also* fn 10, *supra.*

[13] *Similarly see Mount v Dillon,* 200 Ark 153, 157; 138 SW2d 59, 60 (1940).

Remand will ordinarily be directed where the findings themselves are inconsistent, equivocal or contradictory. *The Johnson Electrical Co v State,* 164 Conn 346; 321 A2d 461 (1973); *United States v Hollis,* 424 F2d 188, 192 (CA 4, 1970). *See also Stiefel v McKee,* 1 Cal App 3d 263, 266; 81 Cal Rptr 565, 567–568 (1969).

the judge necessarily found him guilty of second-degree murder.[14] We would remand this cause to the trial court for entry of a judgment convicting Garcia of second-degree murder and for resentencing on that conviction.

## IV

The judge's reading and consideration of the preliminary examination transcript at the suggestion of the prosecutor with the agreement of Garcia's lawyer does not justify a new trial.[15]

The record demonstrates that Garcia was represented by a lawyer who "perform[ed] at least as well as a lawyer with ordinary training and skill in the criminal law and [who] conscientiously protect[ed] his client's interest, undeflected by conflicting considerations". *Beasley v United States,* 491 F2d 687, 696 (CA 6, 1974); *People v Strodder,* 394 Mich 193, 212; 229 NW2d 318 (1975) (Williams, J).[16]

---

[14] *See People v Jenkins,* 395 Mich 440, 443; 236 NW2d 503 (1975).

[15] In *People v Ramsey,* 385 Mich 221; 187 NW2d 887 (1971), the judge asked to see the transcript on his own initiative.

Garcia's lawyer did not, in agreeing to the prosecutor's suggestion, make a "serious mistake" warranting a new trial. *People v Degraffenreid,* 19 Mich App 702, 715; 173 NW2d 317 (1969).

[16] Essentially the same standard is expressed in *People v Degraffenreid, supra,* p 712: "an attorney adequately equipped by his training in the law to undertake the case and who * * * diligently, conscientiously and honestly represent[ed] the accused person".