PEOPLE v WHITE

Docket No. 75650. Submitted December 5, 1984, at Grand Rapids.—
Decided May 7, 1985. Leave to appeal applied for.

Defendant, Roger White, was convicted of first-degree criminal
sexual conduct, Lenawee Circuit Court, Kenneth B. Glaser, Jr.,
J. Defendant appealed, alleging ineffective assistance of counsel
in failing to object to the admission of numerous hearsay
statements made by the five-year-old complainant to two Pro-
tective Services workers. *Held:*

1. There is no longer a tender years exception to the hearsay
rule in Michigan.

·2. The test of effective assistance of counsel in Michigan is
that defense counsel must perform at least as well as a lawyer
with ordinary training and skill in the criminal law and must
conscientiously protect his client's interest, undeflected by con-
flicting considerations, and where defense counsel has not
performed at a minimal level of competence, harmless error
tests are not applied, and a defendant's failure to establish
prejudice by the ineffective representation is not a necessity for
reversal of a conviction. Even where this test is met, the
defendant is entitled to a new trial where he can show that his
counsel made a serious mistake but for which he would have
had a reasonably likely chance for acquittal. Counsel made a
serious mistake in failing to object to the admission of the
hearsay statements. Under the circumstances, failure to object
effectively undermined defendant's theory of the case.

Reversed.

1. EVIDENCE — HEARSAY — TENDER YEARS EXCEPTION — RULES OF
EVIDENCE.

There is no longer a tender years exception to the hearsay rule in
Michigan (MRE 802).

REFERENCES FOR POINTS IN HEADNOTES
[1] 29 Am Jur 2d, Evidence §§ 496, 497 *et seq.*
[2, 3] 21A Am Jur 2d, Criminal Law §§ 982, 984-987.
Modern status of rules and standards in state courts as to adequacy
of defense counsel's representation of criminal client. 2 ALR4th
27.

2. Criminal Law — Assistance of Counsel — Sixth Amendment.

A convicted defendant's claim that counsel's assistance was so defective as to require reversal of his conviction under the Sixth Amendment has two components: first, defendant must show that counsel's performance was deficient, requiring a showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed defendant by the Sixth Amendment and, second, defendant must show that the deficient performance prejudiced the defense by showing that counsel's errors were so serious as to deprive defendant of a fair trial: where, but for counsel's unprofessional errors, there is a reasonable probability that the factfinder would have had a reasonable doubt respecting guilt (US Const, Am VI).

3. Criminal Law — Assistance of Counsel — Constitutional Law.

Under the Michigan Constitution, defense counsel must perform at least as well as a lawyer with ordinary training and skill in the criminal law and must conscientiously protect his client's interest, undeflected by conflicting considerations, and where defense counsel has not performed at a minimal level of competence, harmless error tests are not applied, and a defendant's failure to establish prejudice by the ineffective representation is not a necessity for reversal of a conviction; even where this test is met, the defendant is entitled to a new trial where he can show that his counsel made a serious mistake but for which he would have had a reasonably likely chance for acquittal.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, *Nathan T. Fairchild,* Prosecuting Attorney, and *Michael A. Nickerson,* Assistant Attorney General, for the people.

*Thomas K. Ellis,* for defendant on appeal.

Before: R. M. Maher, P.J., and R. B. Burns and R. E. Robinson,* JJ.

Per Curiam. Defendant was convicted, after a jury trial, of first-degree criminal sexual conduct, MCL 750.520b; MSA 28.788(2), and was sentenced to serve 20 to 40 years imprisonment, with credit for time served. Defendant appeals as of right.

---

* Former circuit judge, sitting on the Court of Appeals by assignment.

On appeal, defendant argues that he was denied his constitutional right to the effective assistance of counsel, alleging numerous errors on the part of counsel. He also argues that the trial court denied him due process by limiting his trial counsel's closing argument to twenty minutes. Of these claims, only one requires reversal.

Defendant was accused of sexually assaulting his girlfriend's five-year-old daugther, Marsha. At trial, it was established that defendant lived with Marsha and Marsha's mother, and that all three slept in the same bedroom. Marsha testified that sometimes (she was unsure how often), during the night, defendant would put his "string" in her mouth and that "something came out of it" which she spat out. She also stated that defendant touched her "in [her] crotch" by putting his finger inside her. Marsha then testified that she stayed with a woman named Pat Sanborn for one day and that she was returned to her mother by a woman named Kathy Johns.[1] On the way home, Marsha told Johns about defendant's putting his finger inside her. Marsha also stated that, on another occasion when she was staying with Sanborn, a man named John Ford came and talked with her about defendant. On that occasion, Marsha was given dolls to play with. She took their clothes off and played house with them. She also demonstrated, using the dolls, what defendant had done to her. During her testimony, Marsha again used the dolls to show the jury what defendant had done. She also pointed to the "string" on the anatomically-correct male doll. Marsha then testified that she visited another man named Roger Henricks. During this visit, she drew a picture of her mother, herself, and defendant. The drawing

---

[1] Marsha's testimony about the names of the people with whom she spoke was elicited by leading questions because of her age.

included the detail of a "string" on defendant. This drawing was shown to the jury. Finally, Marsha stated that she no longer liked defendant and that she was frightened of him.

During cross-examination, Marsha stated that she could not remember if she had ever told Kathy Johns, Mr. Ford, or Roger Henricks anything different from her current testimony. She had talked to them when she was at Pat Sanborn's house. Marsha testified that she did not know whether she had ever told her mother about what defendant had done before she told Johns, Ford, or Henricks. She had never told her mother that she was frightened of defendant and, in fact, she had not been frightened of him when she lived with him. She had formerly liked defendant but did not anymore.

Patricia Sanborn testified that she had briefly had Marsha stay in her home as a foster placement (unrelated to the proceedings involved in this case). Marsha had smelled when she arrived and continued to smell after both she and her clothes had been washed. In Mrs. Sanborn's opinion, the odor resembled that of a vaginal discharge. Sanborn also noticed redness in Marsha's vaginal area. She therefore informed Kathy Johns of the possibility of sexual abuse when Johns appeared to take Marsha home.

Kathy Johns, a Protective Services worker, testified that, as a result of Sanborn's suggestion, she asked Marsha if her mother or father (referring to defendant) had ever hurt her. Marsha told her that defendant had hurt her. Johns then asked if he hurt Marsha on her legs and Marsha replied, "No, he hurts me here" and pointed to her crotch area. She also answered another question by telling Johns that defendant had used his finger.

Marsha did not mention anything about defendant's placing his penis in her mouth.

Roger Henricks, Supervisor of Protective Services, testified that he interviewed Marsha at the Sanborn house. During this interview, Marsha drew a picture of her family at Henricks' suggestion. On her own, Marsha added genital details to the drawing of defendant. She identified the details first as "where he went to the bathroom" and then made up the name "string". Henricks also gave Marsha anatomically-correct dolls with which to play. Using the dolls, Marsha demonstrated what defendant had done to her.

Henricks also testified that he arranged a meeting with Marsha's mother so that Marsha could tell her mother that defendant had sexually molested her. The meeting was necessary because Marsha's mother did not believe that Marsha had actually made the accusation and wanted to hear it in Marsha's own words. At the meeting, Marsha had difficulty telling her mother but Henricks felt that the meeting was successful because Marsha told her mother "essentially" what had occurred between herself and defendant.

On cross-examination, Henricks testified that Marsha was examined by a doctor who found no vaginal discharge, that the hymen was intact, but that there was inflammation in the genital area. The exam showed a "normal female". He also stated that Marsha had mentioned having a boyfriend named Timmy and that she had mentioned being in bed with Timmy. Marsha had also said that Timmy had put his hands on her crotch.

The defense consisted of testimony by friends of defendant and Marsha's mother, to the effect that, on the numerous occasions when the "family" had been seen together, defendant and Marsha had appeared to get along quite well and that Marsha

had never exhibited any fear of defendant. Marsha's mother also testified, stating that Marsha had never feared defendant and had always been affectionate toward him. She did not believe that defendant had molested Marsha; if she had believed the charge, she would have had him arrested as she had, herself, been molested by her father when she was young. Marsha had never told her about any molestation although she had told her about other times when she was hurt. Marsha's mother had never heard or seen anything during the night to suggest that molestation was occurring, although she admitted that she might have been suffering from alcoholic blackouts during that period. Finally, when she spoke to Marsha about the alleged molestation, Marsha had denied that it had occurred until Mr. Henricks had said, "No, no, Marsha, that's not the way it goes".

The final defense witness was defendant. He stated that he had lived with Marsha and her mother for two years and that he had always gotten along well with Marsha. He denied all the accusations of sexual abuse and stated that he loved Marsha very much.

On appeal, defendant argues that his trial counsel was ineffective because he failed to object even once to the numerous hearsay statements made by Marsha which were admitted during the testimony of Kathy Johns and Roger Henricks. It is clear from the record that defense counsel mistakenly believed that such statements were exempt from the hearsay rule, probably under a belief that they were permitted by the "tender years exception". However, as made clear by the Supreme Court's opinion in *People v Kreiner,* 415 Mich 372; 329 NW2d 716 (1982), *reh den* 417 Mich 1104 (1983), this exception did not survive adoption of the

Michigan Rules of Evidence. *Kreiner* was released approximately ten months before this trial. In addition, the testimony plainly reveals that Marsha's statements were deliberate and considered responses during several interviews that occurred a period of time after the alleged assaults. As such, the responses would not have qualified as "excited utterances" under MRE 803(2). See *People v Gee,* 406 Mich 279, 282; 278 NW2d 304 (1979). Had defense counsel objected to the testimony, therefore, he would have been entitled to have the testimony excluded. The issue before us is thus whether or not counsel's failure to object constituted ineffective assistance of counsel.

In this case, defendant has alleged that his counsel's performance at trial denied defendant both a fair trial and the effective assistance of counsel under both Const 1963, art 1, § 17 and the Sixth and Fourteenth Amendments of the United States Constitution. A determination of the effective assistance of counsel under the United States Constitution is to be made according to the standards propounded in *Strickland v Washington,* — US —; 104 S Ct 2052; 80 L Ed 2d 674 (1984). The defendant must identify the specific acts or omissions of counsel which he or she alleges were not the result of "reasonable professional judgment", 104 S Ct 2066, and must show that counsel's performance was "deficient". To show this, a defendant must show that counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment". 104 S Ct 2064. The defendant must also demonstrate that this deficient performance prejudiced the defense. Prejudice will be found where the defendant shows that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would

have been different". This is defined as a "reasonable probability that, absent the errors, the fact-finder would have had a reasonable doubt respecting guilt". 104 S Ct 2068, 2069.

Since 1976, Michigan has applied a somewhat different standard for testing the effectiveness of counsel. In *People v Garcia,* 398 Mich 250, 264; 247 NW2d 547 (1976), the Michigan Supreme Court adopted the test formulated by the Sixth Circuit Court of Appeals in *Beasley v United States,* 491 F2d 687 (CA 6, 1974), as its standard of review of the effectiveness of assistance of counsel. As adopted, the standard required that defense counsel "perform at least as well as a lawyer with ordinary training and skill in the criminal law" and "conscientiously protect his client's interests, undeflected by conflicting considerations". The test was further interpreted to provide that, where a defense counsel failed to perform at this minimum level of competence, harmless error tests were not applied and it was unnecessary to affirmatively establish prejudice. *People v Jenkins,* 99 Mich App 518, 519; 297 NW2d 706 (1980). However, the *Garcia* Court also found that even where a defense counsel's performance satisfied the *"Beasley"* test, the defendant might nevertheless be entitled to a new trial if the defendant would show that his counsel had made a "serious mistake" but for which the defendant would have had a "reasonably likely chance of acquittal".

Although the first "prong" of this test was based upon a federal case, the test has not necessarily been affected by the United States Supreme Court's new standard as expressed in *Strickland.* That standard must be followed by this Court in reviewing federal constitutional claims. However, to the extent the dual standard adopted in *Garcia* offers a defendant greater protection in ineffective

assistance of counsel claims than the standard of *Strickland,* this Court will continue to apply the two-pronged analysis adopted in *Garcia* to state claims of ineffective assistance of counsel until directed to do otherwise by the Michigan Supreme Court. *People v Vicuna,* 141 Mich App 486; 367 NW2d 887 (1985).

In this case, we do not find it necessary to review defendant's claim of ineffective assistance of counsel under the federal test because we find that counsel committed a serious mistake but for which there was a reasonably likely chance of acquittal. As stated earlier, defense counsel failed to object to numerous hearsay statements by Marsha, as recounted by Kathy Johns and Roger Henricks. Other than Marsha's own testimony, there was no evidence which directly showed that defendant had molested Marsha. The medical evidence was inconclusive, and the evidence of Marsha's actions with the dolls and her drawing of defendant merely gave rise to an inference that her verbal statements were truthful. In contradiction to Marsha's testimony, defendant flatly denied having molested Marsha. His testimony was supported by that of Marsha's mother. Thus, this case, like so many criminal sexual assault cases, involved directly contradictory testimony by the complainant and the defendant, unsupported by any direct proof on either side. In such circumstances, corroborating evidence on either side can easily "tip the scales". *People v Gee, supra.* In this case, however, the hearsay testimony related by Johns and Henricks was especially harmful. The underlying theory of the defense, as expressed through the testimony of Marsha's mother and, by inference, through defendant's own testimony and that of his other witnesses, was that Marsha had been led to believe that defendant had molested

her by the insistent inquiries and suggestions of Johns, Henricks, and other representatives of the Department of Protective Services. This theory was supported by evidence that Marsha had never told her mother of the alleged molestation although she normally talked freely to her mother, evidence that Marsha had never exhibited any fear of defendant until after the Protective Services representatives began to talk to her, and Marsha's mother's statement that Marsha denied that defendant had assaulted her until strongly prompted by Henricks. In this context, recitation of Marsha's hearsay conversations with Johns and Henricks served to refute the implication that Marsha had been "persuaded" into believing she was the victim of sexual assaults. Johns's and Henricks's testimony established substantively that Marsha herself made the accusations without undue prompting from Protective Services personnel. Thus, the failure to object to this hearsay testimony effectively undermined defendant's own theory of defense. In these circumstances, we find that the failure to object to the otherwise inadmissible hearsay statements constituted a serious mistake but for which defendant would have had a reasonably likely chance of acquittal.

In light of our resolution of this issue, we need not address defendant's other claims of error.

Reversed.